Jack Silver, *pro hac vice*
Law Office of Jack Silver
California State Bar No. 60575
708 Gravenstein Hwy North, Suite 407
Sebastopol, CA 95472-2808
JsilverEnvironmental@gmail.com
(707) 528-8175
(707) 829-0934 (fax)

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| The Church of the Eagle and the Condor, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>Merrick Garland, *et al.*,<br><br>Defendants. | **Case No. 2:22-cv-01004-PHX-SRB**<br><br>**DECLARATION OF JACK SILVER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND RELATED NON-TAXABLE EXPENSES** |

I, Jack Silver declare as follows:

I have personal knowledge of the facts stated in this Declaration, and if called to testify, I can competently testify to the truth of these facts.

**Introduction**

1.      This case arises out of Plaintiffs' importation, possession, and use of ayahuasca for religious purposes. Ayahuasca prepared for The Church of the Eagle and the Condor ("CEC" or "Church") is a sacramental tea, brewed from only the ayahuasca vine and the chacruna leaf, which has spiritual significance for many indigenous tribes in South

1

America. The chacruna leaf contains trace amounts of N,N-dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act ("CSA").

2.      Only two religious organizations, the União do Vegetal ("UDV") and Church of the Holy Light of the Queen ("Santo Daime,") have received accommodations under the Religious Freedom Restoration Act ("RFRA") to use ayahuasca for religious purposes in the United States. The UDV entered into a settlement with the government in 2010, and the Santo Daime was granted an injunction in 2012 after a full trial on the merits. Since that time, several religious organizations have attempted and failed to receive any exemption from the CSA for the use of a Schedule I substance for religious purposes.

3.      In both the UDV and Santo Daime cases the government was unable to meet its burden of showing a compelling interest in prohibiting these religious organizations from importing, possessing, and using ayahuasca as part of their religious practices.

4.      In the current case, following this Court's denial of Defendants' Motion to Dismiss, the parties engaged in extensive discovery followed by prolonged settlement negotiations which resulted in a Settlement Agreement (*see* Fee Motion, Exhibit A) providing the exact relief sought by Plaintiffs by allowing them to import, manufacture, possess and use ayahuasca for religious purposes.

5.      Having substantially prevailed in this case, and Plaintiffs receiving exactly the relief sought, Plaintiffs now seek an award of attorneys' fees and related non-taxable expenses.

**History Leading to the Filing of this Action**

6.      In 2017, Plaintiffs Joseph Tafur, M.D., Brenda Eriacho, M.P.H., and Church Board Member Dr. Rodney Garcia, M.D., formed the Church in Phoenix, Arizona. The Church has approximately forty-five (45) members and describes itself as a faith-merging belief system that has adopted practices from the indigenous Shipibo people of Peru and the Native North American peoples. Like many indigenous tribes in South America, the Shipibo people consider ayahuasca to be a sacred medicine with spiritual and ceremonial significance. The Church conducts ayahuasca ceremonies to pursue spiritual healing and wholeness, and believes ayahuasca is a conscious spiritual being. The Church and its

members are dedicated to universal spirituality in fulfillment of the Prophecy of the Eagle and the Condor and believe ayahuasca is integral to this prophecy. Specifically, members of the Church believe that the ceremonial use of ayahuasca is expanding beyond South America to merge with Native North American principles in fulfillment of the Prophecy, to engender spiritual community across all races, ethnicities, and nationalities and to instruct its members in understanding and valuing indigenous spiritual practices, emphasizing the importance of maintaining relationships by developing pride in one's body, mind, soul, spirit and honoring all life.

7.      Ayahuasca is the Church's only sacrament. The Church maintains records of its ayahuasca importation and use. The Church screens each prospective ayahuasca ceremony participant for any medical and psychological conditions that may interact with ayahuasca and provides participants with written ceremonial guidelines.

8.      In September 2020, Defendant, U.S. Customs and Border Protection ("CBP") intercepted and seized a shipment of ayahuasca intended for delivery to the Church. Dr. Tafur received the following threat of prosecution bearing the U.S. Department of Homeland Security's ("DHS") seal that stated:

> Notice: Narcotics and/or other contraband prohibited from entry into the United States, have been seized and removed for appropriate action under 19CFR145.509. You will be receiving correspondence from our Fines, Penalties and Forfeitures Branch in the near future.

9.      Plaintiffs received no further correspondence relating this seizure. In March 2021, the Church submitted Freedom of Information Act ("FOIA") requests to CBP and the Drug Enforcement Administration ("DEA") inquiring about ayahuasca seizures. The CBP allegedly indicated it had seized hundreds of shipments of what Plaintiffs believe to be ayahuasca. The CBP and the DEA did not otherwise respond to Plaintiffs' FOIA requests until after Plaintiffs filed this lawsuit. Defendants later communicated that the sacrament was analyzed, then destroyed.

### The Necessity of Staffing

10.     There are very few rights guaranteed by our Constitution more important than the right to practice one's religion. Since the Santo Daime RFRA case in 2009, there have been no other cases successful in granting a religious organization the right to use a Schedule I substance as a sacrament. In fact, numerous RFRA cases have not made it past the motion to dismiss stage of litigation. Since the Santo Daime case, the DEA has done everything in its power to prevent religious organizations from receiving an exemption. Those efforts include: 1) its Diversion Control Division Guidance program which promised a streamlined procedure for receiving an exemption but has yet to result in any approvals, despite numerous applications; 2) the DEA's non-peer reviewed "study" entitled: *Ayahuasca: Risks to Public Health and Safety*, with its many false claims and misrepresentations of the research on ayahuasca; and, 3) the DEA's aggressive, and for the most part successful, litigation of every case seeking an exemption. Since the Santo Daime case in 2009, there have been hundreds of peer-reviewed scientific papers on ayahuasca, thus necessitating the convening of a substantial legal team to ensure a successful outcome for our client.

11.     Each attorney in this case brought to bear unique skills and assets.

12.     I am one of only four attorneys in the country who have successfully litigated a RFRA ayahuasca case on its merits. I bring with me more than thirty years of litigation experience and an in-depth scientific background, with extensive knowledge of toxicology and pharmacology. I am lead counsel.

13.     Gilbert Paul Carrasco is also one of only four attorneys who have successfully litigated a RFRA ayahuasca case on its merits, being an attorney with me on the successful Santo Daime case. Mr. Carrasco is Professor of Law *Emeritus* at Willamette University College of Law, having taught constitutional law and civil rights litigation for over three decades. Mr. Carrasco brings with him his extensive experience in constitutional law and civil rights, having published extensively in the field, as well as his years of litigating constitutional and civil rights cases, including as a trial attorney with the Civil Rights Division of the U.S. Department of Justice in Washington, D.C. He represented the

1    Catholic Church as the highest-ranking lawyer in the United States on immigration matters

2    during the legalization program.

3    14.      Sean McAllister was an attorney for the CEC prior to the filing of this lawsuit and

4    initiated a series of FOIA requests in preparation of this case. Mr. McAllister has been

5    litigating FOIA and CSA-related cases for over twenty-five years and has tried

6    approximately forty-five cases to verdict in front of judges, juries, or arbiters. Mr.

7    McAllister is also a leading expert on the religious use of psychedelic substances, having

8    represented dozens of organizations engaged in this conduct, and is a recognized national

9    expert on the topic as shown by his speeches at major conferences and his published articles

10    and book chapters on this topic.

11    15.      Martha Hartney is the Church's primary counsel, and has served in this role since

12    2019, two years prior to the initiation of this litigation. She prepared the groundwork for

13    the case, wrote a petition under the DEA's RFRA Guidance that was ultimately shelved as

14    unworkable, coordinated fundraising efforts, drafted a large portion of the early pleadings,

15    and conducted ongoing research through the pendency of litigation. She is also an active

16    member of the Church. Ms. Hartney, along with Mr. McAllister, helped prepare the case

17    by working on the Church's FOIA requests. Ms. Hartney is the litigation coordinator and

18    key researcher for the case and brought with her amazing organizational and inspiring

19    people skills that kept the legal team moving forward at all times

20    16.      Ismail Ali currently directs the legal strategy and policy agenda for the

21    Multidisciplinary Association for Psychedelic Studies (MAPS). He brings with him

22    extensive experience in the religious use of Schedule I substances, in particular within

23    today's rapidly evolving landscape of psychedelic drug policy reform. He has contacts with

24    the most experienced scientists and experts in this field. Mr. Ali's skills have been critical

25    in supporting Plaintiffs and their experts in their drafting and research

26    17.      Due to the important nature of this case, the failure of every other religious

27    organization to receive an exemption from the CSA over the past 15+ years, and the DEA's

28    clear and persistent effort to prevent any further exemptions from being granted, a litigation

team of this size and depth was required to achieve the success that it did. By comparison, both the successful UDV and Santo Daime cases employed a similar number of attorneys.

18.     Plaintiffs contacted ten of the largest civil rights firms in Arizona and could not find any that met the criteria of: 1) past experience with RFRA cases; 2) experience with a RFRA case that involved the religious use of a Scheduled I substance; and, 3) would take such a case on contingency. Therefore, out-of-state attorneys were required. **(Exhibit A, Decl. Osuna)**

19.     The attorneys met on a regular basis, discussed the tasks to be accomplished and generally who should handle them.  Being independent and not part of the same firm, each attorney managed their own time.

<strong>Selection of Experts</strong>

20.     This was not an off-the-shelf case for which experts, with previous experience in testifying as an expert in a RFRA case in which the plaintiffs seek the right to use a sacrament containing a Schedule I substance, were readily available. Not since the Santo Daime case 15+ years prior has a case such as this been successful in moving forward through the litigation process. In the Santo Daime case, we employed as experts a psychiatrist, general practitioner medical doctor, pharmacologist, toxicologist and cultural anthropologist who specialized in Amazonia tribal practices using psychotropic plants as a sacrament. Defendants hired a sociologist of religion (Dr. Dawson), a medical doctor and professor specializing in substance abuse (Dr. Jasinski), an epidemiologist (Dr. Walker), a medical psychiatrist (Dr. Kosten), a clinical psychiatrist (Dr. Glass), the then Deputy Director of the Office of Diversion (Ms. Curry), a neuropharacologist (Dr. Frankenheim) and, a DEA pharmacologist (Ms. Tella) now retired. A similar group of experts were used in the UDV case. It was clear from the onset that if this case went to trial it would be decided, to a great extent, on the testimony of the experts. Therefore vetting experts and preparing them for trial became a major project.

a.     Theologian Expert

21.     Both the UDV and the Santo Daime were well established religions at the time their lawsuits began. The CEC, however, is an emergent religion having only been formed in 2017. Although the CEC bases its religion on the well-established Shipibo traditions, it also incorporates native American practices as part of its religion. For this reason Plaintiffs' counsel determined that a theologian would be required to interview members of the Church regarding their beliefs, and to attend a ceremony as an observer. The task of finding a theologian with the requisite experience and willingness to act as an expert was difficult. After being rejected by some and interviewing others, Plaintiffs finally decided on Harvard professor Dr. Charles Stang **(Exhibit B, Stang Curriculum vitae).**

    b.     <u>Psychiatrist Expert</u>

22.     There are just two compelling interests that the Government can assert to prevent religious organizations from using Schedule I substances as a sacrament: 1) harm (both toxicological and psychological) and, 2) diversion. After a rigorous search, Plaintiffs selected Yale Clinical Instructor Dr. Jordan Sloshower **(Exhibit C, Sloshower Curriculum vitae)** to opine regarding the potential medical and psychological harm the members of the CEC might experience from ayahuasca use. For Dr. Sloshower to prepare an expert report it was necessary for him to interview members of the Church both before and after attending a ceremony. If the ayahuasca used by the Church's members during their religious ceremonies will not cause harmful physical or psychological effects, than the Government has no compelling interest under RFRA on which it can rely to restrict the use of ayahuasca by the CEC during religious ceremonies. In both the UDV and the Santo Daime cases, the Government could not meet its burden of proof that ayahuasca posed a significant psychological risk to practitioners. (See *Church of the Holy Light of the Queen, et al. v. Mukasey*, et al., 615 F. Supp. 2d 1210. 1220 (D. Or. 2008) and *Gonzales, et al., v. O Centro Espirita Beneficente Uniao Do Vegetal et al.*, 546 U.S. 418, 437 (2006)) However, as discussed herein, since that time, the number of peer reviewed research papers on the effects of ayahuasca have mushroomed, including the DEA's own non-peer reviewed document *Ayahuasca: Risks to Public Health and Safety* in which the DEA makes

7

several false claims about the risks of ayahuasca to public health and safety. Nonetheless Plaintiffs needed an expert who could present these false claims to the Court in addition to testifying to the safe use of ayahuasca by the CEC given the Church's harm reduction protocols.

c.   Toxicologist

23.   Toxicology is a field of science that studies the harmful effects that chemicals, substances, or situations, can have on people, animals, and the environment. If the ayahuasca used by the CEC members during their religious ceremonies will not cause toxicity, i.e., harmful physical effects, than the Government has no compelling interest under RFRA on which it can rely to restrict the Church's use of ayahuasca during religious ceremonies. Plaintiffs chose Dr. Nicholas Cozzi who was also the toxicologist expert in the Santo Daime case. **(Exhibit D, Cozzi Curriculum vitae)**

d.   Epidemiologist

24.   Epidemiology is a branch of medicine which deals with the incidence, distribution, and possible control of factors relating to health. In both the prior UDV and Santo Daime cases the Government employed Dr. Alexander Walker whose career had been devoted to the epidemiologic study of the safety of drugs, medical devices and vaccines. Because of this prior use of an epidemiologist by the Government, and the fact that the DEA had misrepresented the works of Dr. Jose Bouso, who has written the most extensive epidemiology studies on the use of ayahuasca, Plaintiffs hired Dr. Bouso as their epidemiologist expert. **(Exhibit E, Bouso Curriculum vitae)**

e.   Anthropologist

25.   In the Santo Daime case an anthropologist was obtained to convey to the court the complex synergy between Christianity and the traditional use of ayahuasca by Amazonian tribes as those traditions were interlaced into the Santo Daime practices. Plaintiffs' attorneys here interviewed candidates for this position but later abandoned the idea as Plaintiffs have very limited resources and an anthropologist was considered inessential to the case.

26.     Given the fact that only one of the experts chosen had ever acted as an expert in any lawsuit, let alone a case of this magnitude, it was necessary to have those experts vetted early and educated as to what would be required of an expert in a Federal lawsuit.  Plaintiffs requested the experts provide initial drafts to determine if they fully understood the requirements. Both the expert psychiatrist and theologian had very limited schedules that coordinated with the CEC's ceremonies and the persons they needed to interview. Therefore, Plaintiffs arranged at the earliest available time to have these experts attend a CEC ceremony and interview a significant number of the members of the CEC as was required in the Santo Daime case.

**Procedural Background**

27.     It would be malpractice to file a lawsuit before conducting due diligence.  Therefore, on March 3, 2021, the CEC submitted their FOIA requests to DEA and CBP in preparation to filing suit.  Filing FOIA requests are often essential when considering an action against the federal government.

28.     After receiving partial compliance with the FOIA request, Plaintiffs filed their Complaint in this matter on June 9, 2022, seeking an accommodation for their religious use of ayahuasca under the RFRA.

29.     Defendants filed a Motion to Dismiss on November 15, 2022, arguing that Plaintiffs lacked standing to bring their RFRA claim, and that Plaintiffs otherwise failed to state a claim. Defendants did not seek to dismiss Plaintiffs' FOIA claims. Defendants Motion to Dismiss was not substantially justified given the UDV and Santo Daime cases, wherein the government could not meet its burden to show that it had a compelling interest in preventing those religious organizations from importing, possessing and using ayahuasca for their religious ceremonies, and the allegations in the Plaintiffs' complaint.

30.     Plaintiffs filed their opposition to the Motion on December 14, 2022, Defendants filed their reply on January 5, 2023, and on March 20, 2023, this Court issued its decision denying Defendants' Motion to Dismiss as to Plaintiffs' RFRA claim.

31.     On March 21, 2023, the Court issued its order scheduling the Case Management Conference. On April 13, 2023, the parties filed a Joint Case Management Statement. In the interim, the parties discussed Plaintiffs' FOIA claims. On April 20, 2023, the parties participated in the Initial Case Management Conference and the Court issued its Case Management Order.   Defendants filed their Answer to the Complaint on May 3, 2023.

32.     On May 3, 2023, Plaintiffs propounded their first set of Interrogatories and Requests for Production, to which Defendants raised numerous objections and requests for clarification. The parties met on numerous occasions to resolve Defendants' objections. Defendants never fully complied with Plaintiffs' discovery requests.

33.     On May 19, 2023, Plaintiffs served a second set of Requests for Production.

34.     On June 28, 2023, Defendants provided a portion of the documents requested by Plaintiffs including 120 peer-reviewed papers on ayahuasca and DMT.

35.     On July 3, 2023, Defendants provided Plaintiffs with proposed Protective and Clawback Orders which were issued by the Court on July 11, 2023.

36.     On July 7, 2023, Plaintiffs provided Defendants with notices under FRCP 30(b)(6) for the depositions of DHS/CBP and the DEA.

37.     On July 21, 2023, Defendants served Plaintiffs with a first set of Interrogatories and Requests for production. On July 27, 2023, and again on August 1, 2023, the parties conferred over discovery issues. On August 2, 2023, Plaintiffs served amended Requests for Production. On August 20, 2023, Plaintiffs served responses to Defendants' first set of Interrogatories and Requests for Production.

38.     On September 7, 2023, the parties conferred over Defendants' objections to the FRCP 30(b)(6) deposition notices, and on September 8, 2023, Plaintiffs provided Defendants with revised FRCP 30(b)(6) deposition notices along with a draft stipulation for protocols for taking remote depositions, which I prepared.

39.     On September 12, 2023, counsel for the parties conferred to discuss a path to settlement.

40.     On September 15, 2023, Defendants provided a list of questions to the Church as part of the pre-registration process for the Church to receive an exemption from the CSA to import, possess, and use the Church's sacrament during religious ceremonies, to which Plaintiffs responded on September 22, 2023.

41.     On September 27, 2023, Plaintiffs' serve Defendants with documents responsive to Defendants' first set of Requests for Production.

42.     During October, 2023, the parties exchanged numerous communications aimed at settlement.

43.     On November 1, 2023, six representatives for Defendants conducted a site visit of the location where the CEC stores its sacrament to ascertain whether the diversion protocols are sufficient.

44.     On October 24, 2023, Plaintiffs provided Defendants with a draft settlement proposal.

45.     On November 27, 2023, Defendants provided Plaintiffs with the outcome of the November 1, 2023 visit and a set of requested safety measures.

46.     On December 11, 2023, Defendants provided Plaintiffs with a settlement proposal in response to Plaintiffs' proposal of October 24, 2023.  On December 18, 2023, Plaintiffs provided Defendants with a counterproposal. On January 31, 2024, Defendants provided Plaintiffs with an updated settlement proposal. On February 5, 2024, Plaintiffs provided Defendants with edits to Defendants' settlement proposal of January 31, 2024.

47.     On February 28, 2024, the last day to propound written discovery, I prepared and served on Defendants a second set of Interrogatories, third set of Requests for Production and a first set of Requests for Admissions.

48.     On March 8, 2024, the parties agreed on the final settlement of all terms with the exception of attorneys' fees and costs.  As detailed in Plaintiffs' Fee Motion, the settlement provides for this Court to determine attorneys' fees and costs upon the filing of a fee motion if the parties are not able to agree on this issue within sixty (60) days of the filing a Notice of Settlement and Proposed Order with the Court.  The Settlement Agreement also provides

that this Court would retain jurisdiction to enforce the Settlement Agreement (Plaintiffs' Fee Motion, Exhibit A, Settlement Agreement VII. ¶88). The Settlement Agreement also provides that this Court would retain jurisdiction to enforce the Settlement Agreement (Settlement Agreement IX. ¶91.c.)

49.     On March 29, 2024, having received no indication that final approval of the settlement proposal by the three defendant agencies was imminent, and having received no response to Plaintiffs' February 28, 2024 discovery requests, I contacted defense counsel Ms. Barcia and informed her that all objections to the discovery served on February 28, 2024, were waived and all Requests for Admission were deem admitted. I asked for a Discovery Dispute conference with the Court. In response Ms. Barcia offered to file a Tentative Notice of Settlement to update the Court on the parties' progress in resolving the case.  Ms. Barcia also informed me that the final approval for settlement was out of her hands and had no prediction as to when the Settlement Agreement would, if at all, be approved.

50.     On April 8, 2024, Defendants filed a Notice of Tentative Settlement, and on April 15, 2024, Defendants provided Plaintiffs with the executed Settlement Agreement.  On April 17, 2024, the parties filed a joint Notice of Settlement along with a Proposed Order requesting 60 days to negotiate fees and costs and if unsuccessful, Plaintiffs would file a Motion for Attorneys' Fees and Costs.

### Skills Requisite to Perform Legal Services Properly

51.     I received my B.A. in Microbiology from the University of California, Berkeley in 1976, and after doing post graduate work at U.C. Berkeley and Sonoma State University, I worked in Biotechnology before receiving my J.D. from Empire School of Law in 1992. I have extensive experience in biochemistry and have held patents for microbiological formulations. I worked in the biotechnology industry for 16 years primarily in the development and processing of pharmaceuticals. My scientific understanding of the pharmacological basis of psychotropic and psychoactive substances is extensive.

52.     I am currently a member of the State Bar of California and am admitted to practice before all United States District Courts in California as well as the Ninth Circuit Court of Appeals, in front of which I have appeared several times. My appearance in the present case is pro hac vice.

53.     I was admitted to the California Bar in 1992. Since my admission to the Bar, I have maintained a successful civil and environmental litigation practice representing a variety of nonprofit groups as well as private individuals. Since 1992 I have served as lead counsel in numerous cases. Through such representation, I have developed expertise in litigation and as a trial attorney.

54.     Although my main practice is in environmental law, I was co-counsel in the Oregon District Court case *The Church of the Holy Light of the Queen (CHLQ), et al. v. Holder, et. al.*, CV 08-3095-PA. I wrote the initial draft complaint in that matter detailing the CHLQ's right to use Daime as a sacrament under RFRA as part of an attempt to receive an accommodation from the DEA without the need to file suit.

55.     I was asked to be part of the CEC case for two reasons -- my experience as a trial lawyer and my science background which allowed me to understand the chemistry, pharmacology and toxicology of the substances at issue. Although I am lead counsel for the CEC RFRA claim, I did not participate in the FOIA claim except to review and research the documents that were provided.

**Time Keeping Practices**

56.     The projects performed and time required to perform each project in this successful litigation is set forth in my time sheets attached as **Exhibit H** to this Declaration. Plaintiffs' fee motion and submissions comply with Arizona District Court Local Rule 54.2.  In this narrative I have omitted the obvious, or that which is sufficiently explained in my time sheets.  I did not bill for any hours I spent performing tasks generally performed by a paralegal or investigator at traditional law firms.

57.     In preparing the daily abstract of work, I exercised billing judgment and omitted categories of time which were devoted to activities which, while either necessary to the

conduct of this case and/or clearly advancing the interests of my client, an argument could be made that the hours were not directly part of the litigation process. In my exercise of billing judgment I estimate I excluded approximately 45 hours which included time expended discussing this case with other groups, members of the Church, other attorneys with similar suits, re-reading documents and cases, organizing files, making notes and the like. I have voluntarily omitted an additional 38 hours in telephone calls and emails to experts, members of the Church, other similar groups, and other attorneys as well as hours spent otherwise not requiring an attorney such as copying and compiling documents. In my exercise of billing judgment, I have also omitted approximately 27 hours of time actually spent on matters related to this action but which did not result in issues actually litigated.

58.     It is my practice to maintain contemporaneous records of time spent on legal matters and to update those records from time to time. It is also my practice to omit recording hours which I feel were insufficiently productive or duplicative. As part of preparing this Declaration, I thoroughly reviewed my relevant time records and prepared an abstract of the work performed, eliminating hours relating to excluded projects. I kept track of expenses and verify that those claimed were for costs incurred in this case.

## A Task Oriented Approach

59.     With regard to legal work for which I have been compensated in the past year, my current hourly rate is $875.00, which is below community rates which, in part, are determined by the market as well as the so-called *Kerr* factors: (a) the time and labor required, (b) the novelty and difficulty of the questions involved, (c) the skill requisite to perform the legal service properly, (d) the preclusion of other employment to acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or contingent, (g) time limitations imposed by the client or the circumstances, (h) the amount involved and the results obtained, (i) experience, reputation, and ability, (j) the "undesirability" of the case, (k) the nature and length of the professional relationship with the client, and (l) awards in similar cases. *Kerr v. Screen Extras Guild*, 526 F. 2d 67, 70 (9th Cir. 1975).

14

60.    As my tasks were rather unique it can be seen from each of my projects and tasks there was no duplication and no over-staffing.

61.    It is my practice to formulate a road map for every case consisting of conclusions of law supported by findings of fact which are derived through discovery. This approach is contrasted with the "shotgun" method of asking for everything and looking for anything. The CEC has limited funds and therefore a well-organized discovery plan helped preserve those resources.

62.    It is my experience that in a case of this complexity, discovery tasks such as document inspection and review of research papers should be carried out by an attorney, as a seemingly irrelevant document may later prove to be critical. Defendants provided more than 120 technical research papers that only a person with a sufficient science background such as mine could fully analyze. Plaintiffs also collected more than 240 scientific papers on the subject of ayahuasca or DMT.

63.    If possible I used my legal assistant, a paralegal or investigator to perform tasks which would not require my expertise, and to which I believed those persons were suited.

64.    I drafted this Declaration describing my work on this case, including a detailed listing of hours, and drafted the Memorandum of Points and Authorities supporting Plaintiffs' Fee Motion discussing both the factual as well as legal basis for Plaintiffs' claim for attorneys' fees and costs.

### Experience, Reputation and Ability as Counsel

65.    As discussed herein my skills in this case are unique.  Co-counsel for Plaintiffs Gilbert Paul Carrasco and I are the only attorneys in this case with any experience in litigating a RFRA case. I am the only attorney in this case qualified to review the scientific papers, and am responsible for Plaintiffs' technical experts in toxicology, psychiatry, epidemiology and other harm related issues that might arise due to the pharmacological nature of ayahuasca.

66.    The attached Declaration of David J. Weinsoff **(Exhibit F)** attests to my skills as a litigator and my extensive scientific background.

**Litigation Stage**

    a.    <u>Pre-complaint Stage</u>

67.    On February 4, 2021, I was contacted by an anthropologist, an expert in plant medicines like ayahuasca, regarding the Church's potential RFRA case.

68.    Between August 13 and August 21, 2021 I had numerous conversations with co-counsel Sean McAllister who provided several of the Church's documents I had requested to review. We discussed at length the potential case and the futility of applying for an exemption from the CSA as well as the trap of an administrative action.

69.    On September 6, 2021 I had a telephone conference with the CEC's founder and leader Dr. Joseph Tafur, and on September 9, 2021 Dr. Tafur and I met in person to discuss the case. During our conference I explained to Dr. Tafur that his case would be significantly more complex and difficult than the UDV or Santo Daime cases given that 1) the CEC was a emergent religion, 2) the DEA had promulgated a Risk Assessment that was very critical of the use of ayahuasca; and, 3) in the intervening years since the UDV and Santo Daime cases, there have been hundreds of scientific papers on ayahuasca and DMT.  With Dr. Tafur's understanding of these issues, I agreed to take the case.

70.    I started my work by reviewing all RFRA cases and preparing a litigation roadmap working backwards from the desired conclusions of law, the findings of fact necessary to support those conclusions and the admissible evidence needed to support our findings of fact.

71.    On October 4, 2021 I met with all other co-counsel for Plaintiffs.  We discussed the tasks ahead of us and allocated tasks based upon ability and time. I was lead counsel responsible for overall management, the litigation strategy, reviewing the pleadings and correspondence, helping to select and vet experts, assisting experts on the subject matter of their reports, drafting the opposition to Defendants' motion to dismiss as to standing, RFRA claims and whether or not the court should grant a stay. I was also responsible for drafting Plaintiffs' Fee Motion.

1           b.     Complaint

2    72.     Between October 4, 2021 and the filing of the Complaint on June 9, 2022, I reviewed

3    the applicable law concerning the CSA, the prior ayahuasca cases and other RFRA cases,

4    set forth the criteria for experts including the theologian, toxicologist, psychiatrist and

5    epidemiological expert, and determined whether or not to hire an anthropologist as we had

6    in the Santo Daime case. I reviewed the candidate experts' backgrounds and suitability

7    including their prior work with psychotropic substance used in religious ceremonies

8    including iboga, mushrooms, peyote and ayahuasca. I reviewed the Shipibo religious

9    practices from which the CEC receives their sacrament and incorporates certain traditions.

10    I reviewed the CEC's diversion protocols and harm mitigation as well as the Prophecy of

11    the Eagle and the Condor and how the Church maintained its belief that the use of

12    ayahuasca was an essential sacrament without which the members could not practice their

13    religion and the Church could not provide essential services. I reviewed the depositions,

14    expert reports and trial transcripts from the prior UDV and Santo Daime ayahuasca cases.

15    I also reviewed the CSA and drafted the initial complaint based upon the previous Santo

16    Daime complaint I helped to draft.

17            c.     Motion to Dismiss

18    73.    On November 15, 2022 Defendants filed their Motion to Dismiss, arguing that

19    Plaintiffs lacked standing to bring their RFRA claim, and that Plaintiffs otherwise failed to

20    state a claim. Defendants also argued that the Court should stay the proceedings pending

21    the CEC's formal request for an exemption through the DEA's newly devised Guidance

22    process. As set forth in my timesheets I worked on the opposition to the motion and

23    reviewed and edited all declarations that accompanied the opposition to the motion which

24    was filed on December 14, 2022. I reviewed Defendants' reply to opposition filed on

25    January 5, 2023 including researching the citations therein.

26            d.    Discovery and Pretrial Preparation

27    74.    On March 20, 2023, this Court issued its Order denying Defendants' Motion to

28    Dismiss as to Plaintiffs' RFRA claims. On March 21, 2023, the Court issued its order

setting the Case Management Conference. I worked on the Joint Case Management Statement which was filed on April 13, 2023. On April 20, 2023,  I attended the Initial Case Management Conference and reviewed and calendared the dates set forth in the Court's Case Management Order issued that day.  I reviewed Defendants' Answer to the Complaint filed on May 3, 2023.

75.     As detailed in my timesheets, I worked on Plaintiffs' discovery requests including Interrogatories, Requests for Production and Requests for Admissions. Defendants raised numerous objections and requests for clarification on most of Plaintiffs' discovery requests, and I conferred on numerous occasions with Defendants' counsel Giselle Barcia to resolve those objections.

76.     I drafted a notice under FRCP 30(b)(6) for the deposition of the DEA and helped edit the 30(b)(6) deposition notice for DHS/CBP which were served on Defendants on July 7, 2023. Ms. Barcia raise numerous objections to the deposition notices and would not provide dates for these depositions, necessitating the issuance and service of subpoenas to insure the deponents would appear.

77.     I reviewed and worked on responses to Defendants' first set of interrogatories and requests for production served on July 21, 2023. On July 27, 2023 and again on August 1, 2023 co-counsel and I conferred with Ms. Barcia over discovery issues. On August 2, 2023 Plaintiffs provided amended Requests for Production which I had help to edit. On September 7, 2023, co-counsel and I conferred with Ms. Barcia over Defendants' objections to the 30(b)(6) deposition notices, and on September 8, 2023 we served revised 30(b)(6) deposition notices which I had edited, together with a draft stipulation for protocols for taking remote deposition which I prepared.

78.     On February 28, 2024, the last day that written discovery could be served, I drafted additional Interrogatories, Requests for Production and Requests for Admissions.

79.     Between October 2023 and April 15, 2024, when the executed Settlement Agreement was received from Ms. Barcia,  I continued to work on preparing this case for trial including discussions with experts, setting up procedures for having the CEC's

sacrament tested, drafting additional discovery and preparing for the FRCP 30(b)(6) deposition of the DEA.

        e.      <u>Research</u>

80.    As discussed, there have been more than 240 peer-reviewed scientific papers on ayahuasca or DMT since the Santo Daime case more than 15 years ago.  Defendants provided Plaintiffs with 120 peer-reviewed scientific papers on ayahuasca or DMT.  DEA's non-peer reviewed study entitled *Ayahuasca: Risks to Public Health and Safety*, prepared by Drug and Chemical Evaluation Section, Diversion Control Division of DEA contained 162 mostly peer reviewed studies and several DEA non-peer reviewed "studies."  It was necessary that I read each and every one of these documents to determine if there was any basis Defendants could use to support their claim of compelling interest as to harm. It was also necessary to determine the accuracy of DEA's *Ayahuasca: Risks to Public Health and Safety.* There were none. For instance, on page 3 of that document, under the paragraph entitled *Overview of Ayahuasca's Pharmacological Effects,* the document states: "Adverse health effects (*see* Section III) such as hyperthermia, cardiotoxicity, ataxia, seizures, and coma have been reported for ayahuasca (Callaway et al., 1999; Riba, et al., 2001, 2003; Dos Santos and Strassman, 2011; Szmulewicz et al*.,* 2015)."  However, a review of these documents show that the terms "hyperthermia", "cardiotoxicity", "seizures", or "coma" do not appear anywhere in any of these papers.  Furthermore, there is no indication that any of these symptoms were experienced by the participants in these studies. (See Journal of Psychedelic Studies 2023 - *The DEA report on ayahuasca risks: "Science" in service of prohibition?* https://akjournals.com/view/journals/2054/7/2/article-p81.xm

        f.      <u>Settlement Talks</u>

81.    On September 12, 2023, co-counsel and I conferred with Defendants' counsel Ms. Barcia and Mr. Bowen to discuss a path to settlement. On September 15, 2023, Defendants provided questions for the CEC as part of the pre-registration process for the CEC to receive an accommodation under the CSA to import, possess and use CEC's sacrament

during religious ceremonies. I helped work on the responses which were provided to Ms. Barcia and Mr. Bowen on September 22, 2023.

82.     During October 2023, the parties exchanged numerous communications aimed at settlement. On October 24, 2023 Plaintiffs provided Defendants with a draft settlement proposal. On November 27, 2023 Defendants provided Plaintiffs with the outcome of the November 1, 2023 site visit and a set of requested safety measures which I reviewed. On December 11, 2023 Defendants provided Plaintiffs with a counter settlement proposal which I reviewed. I assisted in preparing a counter proposal which was provided to Defendants on December 18, 2023. On January 31, 2024 Defendants provided Plaintiffs with an updated settlement proposal.

83.     During January and February 2024 the parties exchanged several draft settlement proposals. Finally, on March 8, 2024 the parties agreed on the final settlement terms with the exception of attorneys' fees and costs. However, the final approval of the settlement by the government agencies was significantly delayed. Given the potential rejection of the settlement, and the looming end of fact discovery date, it was necessary to continue to prepare the case for trial. To that end I prepared a second set of Interrogatories, third set of Requests for Production and first set of Requests for Admissions, which were served on the last day that discovery could be served.

84.     While settlement negotiations were ongoing, I drafted Plaintiffs' Request for Attorneys' Fees and Costs to be presented to Defendants as per the terms of the Settlement Agreement.

85.     As discussed herein, a final Settlement Agreement was executed by the parties on April 15, 2024, which provided Plaintiffs all of the relief they had requested.

86.      On April 17, 2024, Plaintiffs provided Defendants' counsel, Giselle Barcia, with Plaintiffs' Request for Attorneys' Fees and Costs, which included a lengthy brief, declarations for all five attorneys, summaries of fees and costs, and, copies of all invoices and receipts.

87.    Late on Friday May 24, 2024, and just before the three-day Memorial Holiday, Ms. Barcia provided Plaintiffs with Defendants' response to Plaintiffs' Request for Fees and Costs.  As part of my review, I researched all of Defendants' citations and relevant 9th Circuit law regarding 42 U.S.C. § 1988, EAJA cases and under 9th Circuit law regarding what constitutes a "prevailing party."

88.    On May 31, 2024, after consultation with Plaintiffs, I sent Ms. Barcia Plaintiffs' response to her counter offer and requested she advise as to her availability the following week to personally discuss settlement and make a good faith effort to resolve all disputed issues relating to attorneys' fees and costs.

89.    On June 5, 2024, the parties conducted a personal consultation and made good faith efforts satisfactorily to resolve all disputed issues relating to attorneys' fees and costs. Representing all counsel, attending the conference for Plaintiffs were Jack Silver, Sean McAllister, Gilbert Carrasco and Martha Hartney. Attending the conference for Defendants was Ms. Barcia. Prior to this meeting the parties had exchanged settlement offers. At the meeting Plaintiffs' counsel agreed to provide Defendants with a further counter offer of settlement.

90.    On June 7, 2024, Plaintiffs provided Defendants' counsel with a further counter offer and included additional information regarding Plaintiffs' entitlement to attorneys' fees and costs.

91.    On June 10, 2024, Ms. Barcia responded to Plaintiffs' second counter offer but would not provide a counter offer.  On June 11, 2024, I responded to Ms. Barcia, advising her that absent a counteroffer from Defendants, the parties' negotiations have come to an end.  On June 14, 2024, Ms. Barcia responded to my email of June 11, 2024, and provided a counteroffer similar to her previous offer.  On June 14, 2024, Plaintiffs, having already substantially reduced their initial proposal for attorneys' fees, I informed Ms. Barcia that the parties were just too far apart and Plaintiffs would be filing their fees motion on June 17, 2024.

92.     Between June 6 and June 14, 2024, I prepared Plaintiffs' Motion for Attorneys' Fees and Non-Taxable Related Costs. I sent drafts to co-counsel and we exchanged several communications including participating in a Zoom conference while Mr. Carrasco was in Lviv, Ukraine.

**Attorney Fee Eligibility, Entitlement and Reasonableness of Request**

a.     Eligibility

93.     Plaintiffs have achieved exactly what they set out to do -- that is to receive an accommodation from the CSA allowing them to import, possess and use ayahuasca in their ceremonies. As detailed in Plaintiffs' Fee Motion, there is no question that Plaintiffs are the prevailing party in this litigation. Under the RFRA, 42 U.S.C. § 2000bb, I am entitled to attorneys' fees pursuant to 42 U.S.C. § 1988 and costs, and other expenses under the Equal Access to Justice Act (EAJA).

b.     Entitlement

94.     The entitlement to fees and costs is covered in Plaintiffs' Fee Motion. Plaintiffs have prevailed on all claims relevant to the relief requested. In awarding attorney's fees, the district court will consider "the significance of the overall relief obtained by the plaintiff," and "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435, (1983). Here, Plaintiffs "succeeded on the most significant issue of litigation . . ." see *Rivera v. City of Riverside*, 763 F.2d 1580, 1582 (9th Cir. 1985).

95.     Plaintiffs substantially prevailed on all issues for which they sought relief, and I should be compensated for all work reasonably expended. *Hensley v. Eckerhart*, 461 U.S. 424, 430 (1983)**.** See also *Davis* v. *County of Los Angeles*, 566 F.2d at 1341, 1344 (9th Cir. 1977) citing *Hensley,* ["Plaintiffs' counsel are entitled to an award of fees for all time reasonably expended in pursuit of the ultimate result achieved."]

c.     Reasonableness of Requested Award

96.     I have detailed 438.1 hours of time in this case to date in my timesheets. A reasonable attorney's fee is determined by calculating the "the number of hours reasonably

22

1   expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*,

2   461 U.S. 424, 433 (1983). I am requesting an hourly fee of $875.00 which is the fee I

3   normally charge for cases and is below the customary fee charged in matters of this type

4   as discussed below.

5           d.      Time and Labor Required of Counsel

6   97.     A review of the time and labor I have expended in the context of the "Kerr factors,"

7   *Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir. 1975), establishes that the time

8   claimed was appropriately expended and, indeed, essential to the successful resolution of

9   this case.

10          e.      Novelty and Difficulty of the Questions Presented

11  98.     There have been very few RFRA cases litigated involving a Schedule I substance

12  and even fewer involving ayahuasca. Only two prior cases involving the use of ayahuasca

13  as a sacrament have been litigated successfully and only one was decided on the merits in

14  2009. The current case presented more novelty and difficulty than the UDV and Santo

15  Daime cases. As discussed herein, since the successful Santo Daime case in 2009, the

16  number of scientific papers on the use of ayahuasca are now substantial, and the DEA's

17  non-peer reviewed treatise on the risks of ayahuasca necessitated Plaintiffs to consult

18  experts in medicine, psychiatry, toxicology and epidemiology.

19          f.      Preclusion of Other Employment by Counsel

20  99.     I have a full time law practice. This case has taken a substantial amount of time

21  away from that practice, such that since taking on this case I have had to reduce my normal

22  work load by approximately 30%.

23          g.      Customary Fee Charged in Matters of the Type Involved

24  100.    The fee contracted between myself and the Church is contingent. (*see* Fee Motion,

25  Exhibit C) There are no RFRA cases that can be used to determine the appropriate fee. In

26  non-RFRA cases, district courts in California awarded the following:

27          - In *Wit, et al., v. United Behavioral Health*, 578 F. Supp. 3d 1060, (ND Cal. 2022)

28  A case regarding liable for breaches of fiduciary duty and violations of the class members'

23

health insurance plans under ERISA, the court awarded the following 2022 rates as reasonable: Years of Experience - Rates: 18 - $825; 21 - $980; 24 - $1,040; 35 - $1,145. In addition to these rates the court approved a 1.5 multiplier.

- In *Cole v. County of Santa Clara*, No., 16-CV-06594-LHK (N.D. 2019), A disability rights action asserting ADA claims on behalf of inmates with mobility disabilities to challenge accessibility of county jails, the court approved the following 2018 rates as reasonable: Years of Experience - Rates: 20 - $775; 13 - $650-655; 8 - $525; 5 - $425; 2 - $375; Paralegal $225-$340.

- In *May v. San Mateo County*, N.D. Cal. No. 3:16-cv-00252-LB, Stipulation and Order re Settlement filed Nov. 10, 2017, an individual police misconduct action, the court found the following hourly rates reasonable: Years of Experience - Rates: 26 - $775; 22 - $775; 10 - $475; 5 - $425; Paralegal - $240

- In *Armstrong v. Brown*, N.D. Cal. No. 4:94-cv-02307-CW, Stipulated Order Confirming Undisputed Attorneys' Fees and Costs, a prisoners' rights action, the court approved the following 2017 hourly rates for monitoring the injunction in that matter: Years of Experience - Rates: 37 - $950; 33 - $825; 20 - $780; 12 - $650; 9 - $490; 8 - $480; 7 - $470; 6 - $440; Paralegal $240-325.

Adjusted for inflation my rate of $875.00 per hour is below local rates.

       h.    <u>Time Limitations Imposed by the Client's Circumstances</u>

101.    Time in this case is of the essence since CEC's members cannot practice their religion without their sacrament and the CEC cannot provide essential services for their client without the CEC's sacrament.

       i.    <u>Value of the Rights, Involved, and the Results Obtained</u>

102.    The right to practice one's religion without governmental interference is one of the most important rights in the Constitution. The result of allowing the CEC to import, possess and use its sacrament during religious ceremonies is exactly the relief this lawsuit was intended to achieve.

       j.    <u>"Undesirability" of the Case</u>

24

103.    Very few attorneys are qualified to take on a RFRA case of this type and fewer will take it on contingency. The CEC had to hire out-of-state attorneys. The CEC could not find any attorney practicing in Arizona with the necessary experience and skills for this case, let alone any that would take a case like this on contingency given the failure of all other similar cases in the past 15+ years. (See Exhibit A, Osuna Decl.).

        k.    Awards in Similar Actions

104.    There have been only two other ayahuasca church cases, the UDV case, in which the government paid the UDV $3,150,000.00 as part of its 2010 settlement, and the Santo Daime case in 2009 in which the court awarded $1,538,480.00. In today's dollars, that would amount to $4,872,667 and $2,235,085, respectively. Also see *Customary Fee Charged in Matters of the Type Involved* section above.

        l.    Significant Time and Labor Were Required to Support Plaintiffs' Claim

105.    I have submitted a detailed account of my hours expended on this case from February 2021 through the present compiled from the contemporaneous daily time logs kept as a matter of course.

106.    Given the uniqueness of this case, the extensive peer reviewed scientific documents post the UDV and Santo Daime cases, and the clear intent of the DEA to prevent any more religious organizations from receiving an exemption from the CSA, I needed to review all peer reviewed ayahuasca studies as well as the 120 scientific documents provided by Defendants including reviewing and checking the accuracy of DEA Risk Assessment citations.

107.    I spent significant time vetting experts as well as conferring with them on their reports. I drafted the initial Settlement Agreement and participated in the settlement negotiations. I drafted Plaintiffs Request for Fee and Costs.

        m.    Difficulty and Complexity of Legal Issues

108.    By definition this was a complex case (see *Manual for Complex Litigation*, 4th Ed). It required an attorney, like myself, who was familiar with RFRA litigation and the CSA as well as an understanding of the pharmacological basis of psychotropic and psychoactive

substances. This not only required extensive research but also the vetting and hiring of a theologian, psychiatrist, toxicologist and epidemiologist.

109.    Defendants' Motion to Dismiss raised several issues not litigated in the previous ayahuasca church cases. Once the court denied Defendants' Motion, Plaintiffs moved forward with discovery and pre-trial preparation.

       n.    <u>Lodestar Multiplier Is Appropriate</u>

110.    As discussed in Plaintiffs' Fee Motion, a lodestar multiplier of 1.5 is appropriate. This was a rare and exceptional case in which superior results were achieved because of the quality of the attorneys' performance. I am one of a very rare number of attorneys who have ever handled a RFRA case dealing with a Schedule I substance. This added complexity requires someone with experience in not only RFRA and religious burdens imposed by the government but emergent religions, the CSA pharmacology, psychiatry, toxicology, epidemiology and anthropology. As such a multiplier of 1.5 is supported by the facts of this case and the case law itself.

**Non-reimbursed Costs**

111.    Attached as **Exhibit G** to this declaration are my non-reimbursed costs in the amount of **$4,654.70** including invoices and receipts. The majority of these non-reimbursed expenses are self-explanatory.  On June 20, 2023, I flew to Denver and attended the Multidisciplinary Association for Psychedelic Studies ("MAPS") Science Conference, which I knew would be attended by several researchers who have written peer-reviewed papers on ayahuasca and DMT, in order to conduct in-person interviews and possibly retain experts for this case.  I met with several researchers studying the religious use of plant medicines which contain Schedule I substances.

**Summation of Fees and Costs**

112.    My timesheets detail 438.1 hours to date, for which I am requesting an hourly fee of $875.00 totaling $383,337.50 and a 1.5 multiplier, bringing the fee request to $575,006.25 **(Exhibit H).**

113.   Attached as **Exhibit I** to this declaration is my paralegal Lisa Mador's summary of hours and invoices for 92.9 hours of work for which I am requesting $250/hour (see *Customary Fee Charged in Matters of the Type Involved* section above) totaling $23,225.00.

114.   A summary of all attorneys' fees requested in this action is provided in Plaintiffs' Fee Motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 17 day of June, 2024, at Sebastopol, California.

_____
JACK SILVER