Martha J. Hartney, Esq. - *pro hac vice*
Hartney Law, LLC
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
Tel.: 303-747-3909
E-mail: martha@hartneylaw.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| The Church of the Eagle and the Condor, *et al*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>Merrick Garland, *et al.*,<br><br>　　　　　　Defendants. | Case No. 2:22-cv-01004-PHX-SRB<br><br>**DECLARATION OF MARTHA J. HARTNEY IN SUPPORT OF PLAINTIFFS' PETITION FOR ATTORNEYS' FEES AND COSTS** |

I, Martha J. Hartney, declare as follows:

　　I have personal knowledge of the facts stated in this Declaration, and if called to testify, I can competently testify to the truth of these facts.

1.　　I received my Bachelor of Arts degree in Journalism in 1989 from the University of Memphis. I received my J.D. from the University of Denver Sturm College of Law in 2009, where I graduated in the 21st percentile of my class. I passed the bar the following spring and was licensed in the State of Colorado in May 2010. My Colorado attorney registration number is 42017.

2.　　I was 43 years old when I received my license to practice law and had a career in marketing/advertising prior to becoming a stay-at-home mother and a volunteer leader in

La Leche League. Due to my age and mothering responsibilities, I opted not to work for a firm but to open my own, now successful practice.

3. I am currently a member of the American Bar Association, the Colorado Bar Association, and the Boulder Bar Association. I have been a member of the Thompson G. Marsh American Inn of Court since 2008, retiring this year from active membership.

4. Since my admission to the Bar in 2010, I have maintained a successful estate planning practice in Boulder, Colorado. My firm was named Best of the West by Yellow Scene Magazine for six years. I have taught estate planning to hundreds of estate planners through a program titled, "The Estate Planning Bootcamp." I am also an end-of-life doula certified by the Conscious Dying Institute in 2017. I was also named a SuperLawyers Rising Star in 2020—though I do not seek or effort to receive such accolades or awards.

5. I am admitted to practice in the Federal District of Colorado and the Federal District of Arizona (pro hac vice pursuant to this case).

6. I am general counsel for Plaintiffs, the Church of the Eagle and the Condor. I am also a member of the Church of the Eagle and the Condor.

7. My resume and curriculum vitae are attached as Exhibit B.

Experience, Reputation, and Ability of Counsel

8. I was the first licensed attorney to be admitted to and graduate from the California Institute of Integral Studies Certificate Program for Psychedelic Therapy and Research—the first such certificate program offered by an accredited university.

9. I am a founding member of the Psychedelic Bar Association and served as its first Religious Use Committee Steward from early 2022 to mid-2023. The PBA is a specialty bar association for legal professionals committed to the highest standards of professionalism, education, and the careful stewardship of psychedelic compounds in an American cultural milieu. In April, I began a 3-year term as a member of the Psychedelic Bar Association's Board of Directors.

10. In 2019, I became a member of Chacruna Institute's Council for the Protection of Sacred Plants—a legal and policy think tank sponsored by Chacruna. I have written several

articles published on Chacruna's website, including, "DEA and the Religious Exemption: A Fox Guarding the Henhouse," published on October 13, 2020; and "Untangling Viewpoints: Getting to Yes on the Natural Medicine Health Act," published on October 6, 2022.

11. In 2016, I began a professional mission to support the safe, responsible, and legal religious use of ayahuasca in the United States and sought the advice and counsel of other professionals who knew about this area of law. This included Nancy Hollander, the attorney who argued the Gonzales v. O Centro case before the Supreme Court, Mr. Jonathan Goldman, the plaintiff in the Church of the Holy Light of the Queen v. Mukasey case; as well as several authors of amici in the UDV case. In my early research, I found there was a miniscule number of attorneys who knew anything about the religious use of ayahuasca.

12. Since I began this mission, I've developed an extensive background in the religious use of ayahuasca and am sought out by other professionals in this field. Because of my knowledge and reputation in a field consisting of only a few professionals with knowledge, I've been asked to appear at conferences, on webinars, and on podcasts.

13. In my practice, I have consulted with dozens of individuals, groups, and churches, primarily relating to the religious use of ayahuasca, best ceremonial practices, safety, diversion prevention, best legal practices, ethics, organizational formation and governance. However, I have devoted the vast majority of my non-estate planning time to this case.

14. Outside of my law school clinical and intern work, I do not have direct litigation experience. Litigation counsel, Mr. Silver, Mr. McAllister, and Mr. Carrasco were brought in to guide the case and spread the labor among a group of attorneys who could commit to potentially protracted litigation. Mr. Ali was brought in due to his extraordinary knack for navigating challenging cultural and interpersonal conversations and to support the client along with me in entering what was a terrifying prospect of revealing their plant medicine work in a culture that does not understand it, demonizes it, and has sought to suppress these traditional ways for over 500 years.

15. That the case resolved more quickly than anticipated is a testament to the strength and extraordinary effort this legal team provided to our client. Through our diligent efforts, we gave the defendants a case they could settle without going to trial

16. I have a strong reputation in the community and provide all my clients with excellent service, advice, attention, and representation. See Exhibits D, E, and F, Declarations of Gregory Kerwin, Matt McClintock, and Joshua R. Benn.

Early Service as Plaintiffs' Counsel

17. I met Dr. Tafur, the primary plaintiff in this case in 2017. Dr. Tafur later invited me to attend a prayer ceremony in Arizona to introduce me to the other founders and members of the Church of the Eagle and the Condor.

18. After this first meeting with the founders of the Church of the Eagle and the Condor, I was invited and agreed to serve as counsel to the church and have served this client nearly exclusively since 2019.

19. In September 2020, Dr. Tafur's shipment of sacramental ayahuasca was seized upon entry into the United States. In October 2020, I counseled the CEC to consider litigation instead of petitioning the DEA for a religious exemption as a futile endeavor and a search began to assemble a legal team that could bring this case to federal court.

20. Because I have served this church for several years prior to the initiation of litigation, the client entrusted me with the management and coordination of this case and with the addition of new lawyers who were unfamiliar with the client's history, beliefs, and practices.

21. The client relied on me to interpret complex legal concepts for them and to manage the legal team's efforts on their behalf. Because I was also a practicing member, I was intimately familiar with the practices and beliefs and was given the responsibility to ensure the client's story was told faithfully, with reverence and respect. I remained the CEC's general counsel throughout this litigation.

FOIA Matters

Page 4 of 19

22. In early 2021, Sean McAllister joined as co-counsel. Mr. McAllister and I represented the CEC in submitting its FOIA requests—representing two of the remaining three claims in this case. Mr. McAllister had primary responsibility for drafting the FOIAs while I provided legal support for this effort. Our goal in submitting these FOIAs was to understand the government's knowledge of and posture in relationship to the religious use of ayahuasca as we explored the possibility of bringing suit in federal court.

23. In the past 15 years, no RFRA case claiming a religious right to use ayahuasca (or any controlled substance) has been successful. Therefore, as part of prudent due diligence prior to filing of this case we submitted the FOIA requests. These FOIA requests were jointly submitted by the CEC and the Chacruna Institute as a watchdog organization with an interest in religious rights to ayahuasca in the U.S. Chacruna joined this initiative in part to help shield our client from potential targeting and retribution by the government. Both FOIA requests included a fee waiver request for searches, due to the watchdog position Chacruna held in the community and the need for the public to know more about what the government's posture toward ayahuasca is.

24. During the process of narrowing our requests for interagency communications pertaining to ayahuasca between CBP and all other governmental agencies, Ms. Amy Miller, FOIA Officer for CBP stated that her initial search of responsive records produced over 80,000 records and quoted a fee of over $11,000 to search these records because our fee waiver request was denied. We appealed the fee waiver denial, and our appeal was also denied—lending more weight to our decision to litigate.

25. Customs and Border Protection provided a partial response to the FOIA request submitted by revising the improper redactions to the Seized Asset Manual and Enforcement Procedures Handbook ("SAMPEH") dated January 2002. However, Mr. McAllister and I were unable to require CBP to search for responsive records for the other FOIA requests and even now have not received any further information from CBP.

26. DEA did not respond at all to either of our two FOIA requests, up to the date of the filing of the lawsuit.

27. As a result of this lawsuit, one *new* document was produced by the DEA titled, *Ayahuasca: Risks to Public Health and Safety*, ("DEA Risk Assessment"). This document, written in 2020, cites 120 outside studies and papers later produced in response to Plaintiffs' RFPs. Defendants' large dump of information had to be sifted through by an attorney to assess relevancy to the case as well as to identify many egregiously misstated conclusions embedded in the DEA Risk Assessment. This research produced a large expenditure of attorney time, not at the plaintiffs' discretion.

28. A comparison of my timesheets with Mr. McAllister's will show no duplicative billing and that I proceeded with care to divide the workload according to our respective skill and availability.

Case Initiation and the Complaint

29. Strategy development began in September 2021. Drafting of the complaint began in October 2021. Because I served as the CEC's general counsel and had knowledge of the facts of this case, I took responsibility for drafting the "Statement of Facts" section of the Complaint. Our team labored on the Complaint for nine months to ensure the very best initial telling of the Plaintiffs' story—which has resulted in the best outcome for our client.

30. In each successive point of the case, I took responsibility for ensuring the Plaintiff's narrative was carefully represented according to their lived experience and actual beliefs. I played a key role in drafting and editing; review and redrafting; counseling the client; coordinating attorney labor; conducting legal research; acquiring the services of experts; coordinating our experts with the legal team; assisting in discovery activities, and supporting our clients in their litigation activities.

31. Because I drafted the initial versions of the complaint and do not have litigation experience, I exercised a high degree of billing restraint. As the court will see from the timesheets produced, I have only billed a small portion of the actual time spent drafting—much of which was well into the wee hours of the night—to assure that each word was precisely chosen for maximum meaning and impact, both for this court and for the

defendants. Drafting was supervised by Mr. Silver and reviewed by Mr. McAllister, Mr. Carrasco, and Mr. Ali.

Motion to Dismiss

32. The CEC was the first RFRA plaintiff in a religious use context to survive the Motion to Dismiss since the Santo Daime case in 2008. No other plaintiff had managed to argue their case sufficiently to reach this point. Mr. Silver and Mr. Carrasco were the key figures in drafting this motion, while I provided both legal research and citation verification for the Defendants' pleadings and the Plaintiffs' response. Additionally, I conducted extensive research into other cases that were prosecuted by or under the influence of the Defendants, filing a declaration supporting our assertion of an injury-in-fact and an expectation of prosecution in light of the injury of the seizure of the Plaintiffs' sacrament.

Experts

33. The outcome of this case was, from the outset, going to hinge on the testimony of experts. Our first hurdle would be to prove the *bona fides* of an emergent church in the U.S. that did not look like traditional religions. Our second hurdle would be proving that ayahuasca is safe when provided in the ceremonial context of the CEC's religious use. I began to search for the most appropriate experts early in the litigation because I assessed that opposing counsel would first attempt to undermine the religious sincerity of our client and claim that ayahuasca is not safe.

34. Because sincere bona fide religious belief is an element of the prima facie case, I concluded that it was necessary to hire a theologian expert early and in advance of the defendants' motion to dismiss to be prepared for the likely argument that the CEC was not a bona fide religion.

35. It was my task to research, identify, and contact suitable candidates whose opinion and/or testimony would well support the Plaintiffs' claim for a religious accommodation. I considered many candidates from both academic and clerical backgrounds, and ultimately hired Dr. Charles Stang, Director of the Harvard Divinity School's Center for the Study of

World Religions. Sifting through many possible candidates, I assessed their backgrounds and credentials to determine whose would be able to assess whether the CEC was a real religion sincerely believed. I read candidates' written articles, podcasts, video appearances, and canvassed networks to assess credentials, knowledge education, employment, and credibility. Simultaneously, I also gathered relevant background information on RFRA and First Amendment law and prepared materials for the hired expert to understand the legal landscape as well as prepared materials relating to the provision of expert reports and testimony in federal court.

36. Shortly after I hired Dr. Stang, I arranged for him to begin interviewing members of the CEC and later attend an ayahuasca ceremony to observe and develop his opinion. Dr. Stang spent many hours educating himself on the nature of Amazonian plant medicine and becoming acquainted with the CEC and its membership before starting to develop his opinions. It was also my job, shared with Mr. Ali, to coordinate his information-gathering tasks.

37. We also required the opinion of a psychiatrist to assure this court that the CEC's practices are safe for members. After interviewing several candidates, I selected Dr. Jordan Sloshower to determine whether the CEC's practices are safe and whether there would be psychological impact on the members if they were not permitted to use their sacramental ayahuasca.

38. I determined our experts would need to observe CEC's ayahausca ceremony live to arrive at reliable and descriptive opinions for this court's consideration. Therefore, I organized a ceremony in June 2023 in Phoenix, AZ in which both Dr. Stang and Dr. Sloshower attended and observed. The costs for the experts' time and travel have been included in our fee motion as essential elements to our case. I organized this observation ceremony and traveled to Phoenix to attend and support the experts through two days of ceremony and assist the plaintiffs through this important element of discovery.

39. Both experts produced initial reports based on their initial investigations. Continued development of these reports was put on hold when the first Order Extending Discovery

was issued by this court on October 17, 2023 and only modest additional expert fees were incurred after the issuance of that order.

40.     Our experts agreed to partial payment for this extensive expedition to witness ceremony first-hand on the condition that full payment would be requested upon submission of Plaintiffs' fees and costs. The court will note that additional invoices were submitted by our experts for their previously uncompensated, unbilled time.

Discovery and Pretrial Preparation

41.     As the CEC's counsel, during discovery, it was my task to ensure the CEC's initial and subsequent disclosures were prepared and submitted; and to produce initial drafts of the CEC's replies to the defendants' interrogatories, including objections and responses.

42.     I managed Plaintiffs' responses to Defendants' discovery requests, organizing their required productions, and assisting with drafting Plaintiffs' responses to Defendants' interrogatories and requests for production with Mr. Silver.

43.     I assisted the team's initial preparation for depositions scheduled for Fall 2023 by preparing topics for deposition, reading transcripts from the UDV case (*Gonzales v. O Centro*), evidentiary hearing and expert reports and transcripts from the Santo Daime (*Church of the Holy Light of the Queen v. Mukasey*) case. I researched potential experts that may be produced by Defendants and what their positions and arguments may be and developing counterarguments to those positions. This work paused upon the issuance of the Order Extending Discovery.

Research

44.     I took responsibility for legal research for our team from the initial FOIA requests, the complaint, motion to dismiss, settlement negotiations, and to fees and costs. Each of these major topics implicated many sub-issues requiring investigation.

45.     For example, in early 2023, I researched whether any regulations, beyond the DEA's importation registration framework, might apply to the importation of ayahuasca. I researched the labyrinthine importation regulations for the FDA, USDA, DEA, DHHS, and

CBP to 1.) determine whether we had included all necessary parties in our suit and 2.) ensure we are informed of any additional regulatory requirements for importation of ayahausca. I spent far more than the 16.85 hours billed on this topic as the multi-agency regulatory framework is vast and obtuse. Nevertheless, based on this research we concluded that we had involved all the necessary parties and would not be caught unaware of applicable regulations.

46. In preparation for depositions, before the initiation of settlement negotiations, I studied the transcripts from the two prior RFRA ayahuasca cases, continued to monitor and ensure the team was informed of concurrent cases in federal district court, and helped develop deposition materials for the key litigators who would depose the defendants.

47. Concurrent cases involving controlled substances surfaced legal issues requiring continual monitoring and research. *Soul Quest v. AG* pointed to jurisdictional issues under the Controlled Substances Act, 21 U.S.C. § 877, Judicial Review. 92 F.4th 953, (11th Cir. 2023).

48. *AIMS v. Garland*, 4:22-cv-02396 (S.D. Texas) illuminated the DEA's posture toward medical use of controlled substances under the Right-to-Try law and DEA's recalcitrance toward any FOIA request pertaining to legal access to controlled substances.

49. *Church of Iowaska v. IRS*, 1:21-cv-02475 (D. D.C.) illustrated issues relating to absent parties and agency law.

50. *Sisley v. DEA* implicated issues of agency exhaustion of administrative remedies relevant to this case. 11 F.4th 1029, (9th Cir., 2021).

51. *Arizona Yage Assembly v. Garland,* in this Arizona federal district was actively monitored due to its similarity to this case and the arguments employed by counsel in that case carefully assessed.

52. During the initial complaint phase, I researched many topics in shaping the theory of the case including extensive legal research on the Strict Scrutiny analysis of RFRA, the scope of "religion," what is meant by "sincerity," as well as jurisdictional issues pertaining to Article III standing, injury-in-fact, associational standing, international treaties

pertaining to traditional medicines and controlled substances, international agencies controlling substances, and precedential and non-precedential case law.

53. During the motion-to-dismiss phase, I continued research on *injury-in-fact* as this was a key component of the Defendants' argument to this court to dismiss—in which the key case on point (*Oklevueha I*) was found to diffuse the Defendants' argument wholesale.

54. Furthermore, because the DEA Risk Assessment document egregiously misquoted, misapplied, and misstated scientific conclusions, I contacted some of the researchers to inquire into whether they would be willing to offer expert consultation countermanding the government's inaccurate conclusions. I arranged for Dr. José Carlos Bouso, one of the most often misquoted researchers, to consult and testify on behalf of the CEC to impeach the validity of this government-produced document.

55. I spent many hours cross-referencing the DEA's Risk Assessment document against the citations therein, discovering that almost none of the conclusions reached in this document aligned with the studies cited for those conclusions. I have taken no discounts for this research, but I did not bill for the initial inventorying of Defendants' large document dump.

56. During settlement negotiations, I researched issues arising out of regulations pertaining to Schedule 1 registrations, importation, specific phrases added in or left out of the settlement, comparing text from the instant settlement document with the UDV document, limits of rights to revoke registrations, and registration renewal. I also assisted the Plaintiffs with researching practical aspects of shipping a controlled substance from the Peru to the U.S.

57. During the fee negotiation phase, I researched critical issues such as "prevailing party," standards of review, judicial discretion and reductions in fee awards, 42 U.S. C. Section 1988(b), the Equal Access to Justice Act, fees recoverable under FOIA, lodestar enhancements, and fee awards in Arizona and Colorado.

58. Throughout the case, we were well-prepared to proceed to trial. While we have arrived at an alternate conclusion to the case, the CEC expended extensive attorney time and incurred costs to bring this case in a manner that could be settled, rather than litigated.

Client Support and Communication

59. I had primary responsibility for client care during a challenging time for them. Mr. Ali, due to his extraordinary communication skills, assisted and coordinated with me and with our clients to support them while enduring litigation to secure their religious rights and protect them from prosecution.

60. I had frequent contact with the named plaintiffs, much of which is not billed due to either the short nature (<10 minutes) or to the more personal coaching nature of these contacts, which I am willing to forego as non-legal, but critical work. However, I have billed any time I spent in CEC board meetings bringing the client up to speed and travel to several in-person meetings required to keep the litigation on track.

61. Mr. Ali provided client care, direction, support, and coordination during the early stages while declarations were being written by declarants and named plaintiffs and during Dr. Stang's early investigatory work.

Settlement Discussions

62. On September 12, 2023, opposing counsel expressed a desire to engage in settlement talks.

63. On September 15, 2023, opposing counsel submitted a series of questions to be answered required to proceed with settlement talks. The plaintiffs responded on September 22, 2023. I supported drafting the responsive answers. A second set of questions were requested by defendants a week later and another set of answers were provided—which I also helped draft.

64. On November 1, 2023, defendants sent six representatives to conduct a site visit to Dr. Tafur's residence in the Phoenix area. Plaintiffs sent three attorneys to accompany Dr. Tafur and Mr. Sullivan in this process. I attended this meeting.

65. From mid-November to mid-April, plaintiffs and defendants engaged in negotiations, resulting in the present final agreement, with the only remaining unsettled element being attorneys' fees and costs.

Costs

66. Plaintiffs paid out-of-pocket costs in the amount of $60,737.25. This includes $48,531.98 in expert fees as well as the following costs for:

- Air and land travel to the client in Arizona for several in person meetings for me, Mr. Carrasco, and Mr. McAllister.
- Air and land travel to DEA site inspection held on November 1, 2023 for me, Mr. Carrasco, and Mr. McAllister.
- Land travel for Mr. Silver and Mr. Carrasco to Oregon to meet with Mr. Jonathan Goldman and staff.
- Organizing a shipment of ayahuasca samples to the United States for laboratory testing (we did not incur costs for this testing because it was obviated by the settlement).
- Fees paid to CBP for the original FOIA searches.
- Attorney's fees paid to a prior consulting attorney.
- Paralegal fees on behalf of Mr. Silver's paralegal who assisted with document preparation, filing, and service of process.
- Attached as Exhibit C to this declaration is a spreadsheet providing an overview and explanation for each item as well as receipts and invoices as proof.

Billing Practices

67. It is my practice to maintain contemporaneous records of time spent on legal matters and to discount hours exercise billing restraint as I determined is fair and necessary at that time. I utilize a timekeeping system called "Clio."

68. I have exercised extraordinary restraint in billing. I have not billed for any tasks performed by my legal assistant, amounting to approximately 40 hours. I have overlooked countless emails and phone calls that took less than six minutes as well as many that were more than six minutes such as scheduling/coordinating emails, texts, and calls, and team-

building and appreciation communications. I have not billed for any time reviewing emails between team members of which I needed to be aware but did not need to take action on.

69. I have excluded all meeting time in which I observed but did not contribute materially to the conversation.

70. I have underbilled portions of my work. For example, I only billed ~10.5 hours for researching an appropriate theologian expert. My actual time at this task was well over 20 hours, including time watching presentations, listening to podcasts, or conference appearances of candidate experts, then contacting and interviewing the different candidates.

71. I billed only approximately 23 hours for drafting and re-drafting the complaint, though the actual time was well over 100 hours and comprised nine versions before a final was ready for submission to this court.

72. As managing attorney and litigation coordinator, I worked to ensure minimal duplication occurred throughout the pendency of the case. When one or two attorneys were able to manage an aspect of the case development, I ensured other attorneys were not also acting in the exact same capacity. I have excluded most of my email and phone communication in coordinating these elements and tasks of the case such that defendants would not have to pay duplicative fees.

73. I have excluded all time spent on client matters with the CEC unrelated to this case or related to the case but of minimal interest or concern.

74. I have excluded all time spent preparing and executing a crowdfunding initiative that provided the funds to the CEC to pay their out-of-pocket expenses.

75. I have excluded time expended for several time-intensive prayer ceremonies required and organized by the client in direct service to the case.

76. I have so far refrained from billing "fees on fees" for the time being. I retain the right to request additional fees for work performed that is necessitated by the tactics of opposing counsel.

Eligibility, Entitlement

77. The entitlement and eligibility of plaintiffs' counsel to fees and costs is covered in Plaintiff's Fee Motion. As discussed in the Fee Motion, Plaintiffs have achieved exactly what they set out to do, that is to receive an exemption from the CSA allowing them to legally import, possess and use ayahuasca. Plaintiffs and their counsel consider this case to be a complete victory. The CEC is the first non-Christian church to achieve this outcome, securing its status as a "prevailing party" through a settlement that resolves its dispute by fundamentally altering the legal relationship between itself and the defendant. *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 792 (1982).

78. Fees are herein sought under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, under which Plaintiffs are entitled to attorneys' fees, costs, and other expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1983. 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976, provides: "In any action or proceeding to enforce sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, the Religious Freedom Restoration Act of 1993, or Title VI of the Civil Rights Act of 1964, or section 40302 of the Violence Against Women Act of 1994, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Reasonableness of Fees Requested

79. As noted in Plaintiffs' Fee Request, a reasonable attorneys' fee is determined by calculating the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This "lodestar" is presumed to represent an appropriate fee. *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1541-42 (9th Cir. 1992).

80. The Ninth Circuit adopted the "Kerr factors" to determine "the number of hours reasonably expended." *Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir. 1975). (1) the time and labor required; (2) the novelty and difficulty of the question involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by

the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

81. Plaintiffs' Fee Request discusses these factors in more depth. However, I note some special circumstances here pertaining to my individual fee request.

Reasonable Hourly Rate Requested

82. I am based in Boulder, Colorado, a suburb of Denver. As described in Plaintiffs' fee motion, local counsel in Arizona was unavailable to handle this specialized type of litigation. As such, rates outside the forum should be used. *Camacho v. Bridgeport Fin., Inc.*, 523 F. 3d 973, 979 (9th Cir. 2008); *see also* Order of Judge Roslyn O. Silver, *Prison Legal News v. Ryan*, No. CV-15-02245-PHX-ROS (D. Ariz. 3/19/2024) (finding out-of-state rates appropriate and awarding Plaintiff $2,370,881.67 in fees and expenses).

83. The fee contracted between the Plaintiffs and me was contingent. See attached Exhibit C to the Fee Motion, CEC Legal Services Agreement.

84. There are no RFRA cases involving a Schedule I controlled substance to inform the customary fee charged. There were two cases in 2006 and 2009 in which the government settled attorneys' fees and costs in favor of the plaintiff, as here. The negotiated settlement in these cases resulted in flat amounts awarded, against which I am unable to determine the hourly rates or reasonable number of hours.

85. There are very few recent civil rights cases in my local area of Denver in which attorneys' fees were awarded under §1988(b), however, the following may provide guidance:

- In *Duran v. Koehler*, 2014 U.S. Dist. LEXIS 117851, (D. Colo. 2014), a §1983 civil rights case involving the illegal beating of an arrestee, the Court awarded fees ranging from $450 to $500 per hour for partners and $300 to $350 for associates.

- In *Valdez v. Motkya*, 15-cv-0109-WJM-STV, 22 WL 1092182 (D. Colo. 2022), Colorado Judge Martinez determined that fees ranging from $575 to $595 for a law firm shareholder is reasonable.
- In *Lopez-Valenzuela v. Maricopa County*, this Court awarded ACLU and MALDEF attorneys' fees ranging from $450 to $515. For the attorneys with comparable length of service, this Court awarded fees on the order of $450. In today's dollars, that amount would be $595.30. 2015 U.S. Dist. LEXIS 183177 (D. Ariz. 2015).

86. For this case, I am requesting $550.00 per hour, which I arrived at by taking my regular hourly rate of $500.00 and adding a small additional amount to account for the high-risk contingency nature of the recovery. Furthermore, litigation firms in Denver routinely bill their associates at similar rates and often much higher. I have conferred with other counsel in the area, who, though unwilling to provide a publicly available declaration as to their firm's rates, have confirmed that a rate of $550.00 in Colorado is reasonable.

87. On June 10, 2024, I conferred with a well-known cannabis firm in Denver who requested not to be identified regarding their rates. A senior partner provided these as their current hourly billing rates:

Partner and Department Chairs $480 - $795

Counsel $420 - $520

Sr. Assoc. $340 - $425

Associates $290 - $370

Specialists/Directors $215 - $520

88. This $550.00 rate is commensurate with a 14-year counsel working in a specialized field, accepting extraordinary risk in bringing a novel case, on contingency, and achieving exactly the results our client demanded. It is also commensurate with inflation-adjusted

rates this Court has awarded attorneys with a similar amount of experience, while providing a discount for my lack of litigation experience.

Reasonable Number of Hours

89. In light of the extraordinary breadth of topics and tasks that needed to be performed by an attorney with knowledge of the CEC, its leaders and members, as well as its beliefs and practices, I submit the number of hours I am requesting understates the actual number of hours worked on this case by a large degree and is therefore rational and reasonable.

90. I have exercised billing judgment by eliminating more than 20% of my billing, amounting to $83,380.00—while also excluding many after-hours work *ab initio* due to my commitment to the success of this case.

91. Where, however, Defendants' actions forced additional work, I did not reduce my hours. For example, I have billed 36.65 hours for analyzing the citations of the DEA Risk Assessment document for veracity, relevancy, and accuracy as previously described. I did not bill to inventory the large dump of Defendants' disclosed documents, which amounted to 36.00 hours.

Lodestar Multiplier is Appropriate

92. As noted in Plaintiffs' Fee Request, this case is the rare and exceptional case in which superior results were obtained for our client due to the extraordinary performance of the entire legal team in securing these results. A lodestar multiplier of 1.5x (calculated as a 50% enhancement over the requested base rate) is appropriate in this case.

93. An award of the standard lodestar calculation is not "adequate to attract competent counsel," *Perdue*, 559 U.S at 554 (*Blum*, 465 US at 897, 901). See also *Wing v Asarco, Inc.,* 114 F.3d 986 (9th Cir. 1997) (upholding a 2.0 multiplier). Cases such as this are undesirable, even in the psychedelic legal community because potential plaintiffs often do not have the resources to pay even out-of-pocket expenses—and success is anything but assured—as proved by the utter absence of winning cases since 2009. There are currently two other RFRA/ayahuasca cases in federal court—neither of which have been presented

with the opportunity to settle out of court under terms acceptable to the plaintiff. A third, Soul Quest in the 11th Circuit, has resulted in repeated losses for the plaintiff.

94. This case is unlike other civil rights cases in that few attorneys know anything about ayahuasca, much less the application of RFRA to this circumstance. There are precious few attorneys willing to risk the extreme expenditure of time and firm resources to religious right to use a controlled substance. Awarding a lodestar enhancer will help attract more counsel to aid the 24 DEA religious applicants who have sat in limbo, some for many years, to demand that our government not run roughshod over people's religious rights. https://www.gao.gov/products/gao-24-106630 (last visited June 10, 2024).

Summation of Fees and Costs

95. Finally, I drafted this Declaration describing my compensable work on this case. Attached to this Declaration as Exhibit A are my timesheets detailing 564.15 hours to date containing sufficiently detailed descriptions of each item to satisfy Ariz. LRCiv. 54.2 (d).

96. I am requesting an hourly rate of $550.00 and a total of 564.15 hours for a subtotal of $310,282.50. Applying a 1.5x lodestar multiplier as requested above, bringing the requested fee to $465,423.75.

97. All of my out-of-pocket costs requested have been paid by the CEC and are reflected on the Church's costs reimbursement request.

98. I retain the right to update my timesheets reflecting additional time spent on substantive matters or "fees on fees," from the date of this declaration, if necessary.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on June 15, 2024, at Boulder, Colorado.

/s/ Martha J. Hartney
Martha J. Hartney, Esq.