Gilbert Paul Carrasco, Esq., *pro hac vice*
California State Bar No. 90838 (active)
District of Columbia Bar No. 334722 (active)
900 Pacific Coast Highway, Suite # 305
Huntington Beach, CA 92648-4863
Mobile: (503) 990-4879
E-mail: carrasco@willamette.edu

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

The Church of the Eagle and the Condor, *et al.,*

                    Plaintiffs,

        v.

Merrick Garland, *et al.*,

                    Defendants.

**Case No. 2:22-cv-01004-PHX-SRB**

**DECLARATION OF GILBERT PAUL CARRASCO IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND RELATED NON-TAXABLE EXPENSES**

I, Gilbert Paul Carrasco declare as follows:

1.      The information contained in this Declaration is true and correct to the best of my knowledge, and I am of majority age and competent to testify about the matters set forth herein.

2.      I am Professor of Law *Emeritus* at Willamette University College of Law in Salem, Oregon, now practicing law in Huntington Beach, California, and am counsel for Plaintiffs The Church of the Eagle and the Condor, Joseph Tafur, M.D., Kewal Wright, Belinda

1    Eriacho, M.P.H., Benjaman Sullivan, and Joseph Bellus in the above-entitled action. I offer

2    this Declaration in support of Plaintiffs' Motion for Award of Attorneys' Fees and Related

3    Non-taxable Expenses under 42 U.S.C. § 1988 (b).

4    3.        For my work, Plaintiffs seek a total of $ 388,430, for 434 hours reasonably expended

5    working on the merits of this case. A **task-based itemized statement** that reflects the **date**

6    **on which the service was performed, the time devoted to each unrelated individual**

7    **task, and a description of the service provided** is attached as **Exhibit A**. Additionally,

8    Plaintiffs seek an additional $ 59,070 for 66 hours I reasonably expended working on this

9    fee petition **(Exhibit B).** It is "well established that time spent preparing fee applications

10   under 42 U.S.C. § 1988 is compensable." *Gonzales v. City of Maywood*, 729 F. 3d 1196,

11   1210 (9th Cir. 2013). Based on the reasonable market rate of $ 895 per hour for a total of

12   497.5 hours, the total is $ 445,262.50. With a 50 % enhancement, the total is $671,250. My

13   paralegal, Iryna Zaverukha, whom I supervised, worked 5.5 hours and bills at $ 200 per

14   hour, so her total is $1100 **(Exhibit C)**. She is not requesting an enhancement. The total

15   amount requested is $ 672,350. These calculations are based on the specific attorney time

16   records in the above-referenced Exhibits. Plaintiffs have reimbursed my **expenses and**

17   **costs**, as specified in Plaintiffs' Motion.

18                                   **Qualifications and Expertise**

19   4.        I graduated from the University of San Diego with a degree in Philosophy (B.A.,

20   1975), from the University of Santa Clara School of Law (J.D., 1978), and from

21   Georgetown University Law Center (LL.M., Constitutional Law, 1979). I was admitted to

22   practice in California in 1979 and have been an active member of the California Bar since

23   then. I was admitted to practice in the District of Columbia in 1980 and have been an active

24   member of the D.C. Bar since then. I am admitted to practice in the Supreme Court of the

25   United States (1983); in the U.S. Courts of Appeals for the Third, Fifth, and Ninth Circuits;

26   in the Southern District of Alabama, in the U.S. District Court for the District of Columbia,

27   and in the Central, Southern, Northern, and Eastern Districts of California. I have also been

28

1    admitted *pro hac vice* in various other jurisdictions, including in the District of Arizona in

2    this case.

3    5.    Before I transitioned to Professor of Law *Emeritus* at Willamette University College

4    of Law, I taught Constitutional Law and Civil Rights Litigation, including various aspects

5    of the Religious Freedom Restoration Act of 1993 and the Religion Clauses of the First

6    Amendment, for two decades as a tenured Professor of Law. Previously I taught those

7    subjects as a tenured Professor of Law for a decade at Villanova University School of Law.

8    Before going into teaching, I practiced law for a decade in various capacities. Throughout

9    my career, spanning over four decades, I have specialized in Constitutional Law and other

10   complex, high-profile Civil Rights Litigation.

11   6.    I have represented religious institutions besides The Church of the Eagle and the

12   Condor, including the Church of the Holy Light of the Queen (*Santo Daime*) as one of two

13   lawyers on the original Complaint in that case and as one of a team of lawyers through

14   trial. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp 2d 1210 (D. Or.

15   2009). Until the instant case, this is one of only two cases that had established the religious

16   right to consume *ayahuasca* as a sacrament notwithstanding its prohibition in the

17   Controlled Substances Act. As National Director of Immigration Services based in

18   Washington, D.C., I was also the highest-ranking lawyer for the Catholic Church in the

19   United States on immigration matters during the legalization period, 1986 – 1988.

20   7.    After law school, in 1980 I was appointed Special Assistant to the Deputy Assistant

21   Attorney General in the Civil Rights Division of the U.S. Department of Justice, based in

22   Washington, and thereafter served as a Trial Attorney handling complex cases there until

23   1984. In that capacity I drafted the Complaint and served as lead counsel in *United States*

24   *v. Town of Cicero*, which was the first case in the history of the Department to include

25   claims under both Title VIII (the Fair Housing Act) and Title VII (the employment

26   provisions of the Civil Rights Act of 1964), both of which came to successful conclusions.

27   786 F. 2d 331 (7th Cir. 1986). Another significant case on which I was lead counsel that

28   settled before trial was *United States v. Central State Hospital Credit Union* (N.D. Ga.),

which was significant because the settlement included the remedy of restitution, giving victims of discrimination monetary relief under the Equal Credit Opportunity Act, unusual relief for the Civil Rights Division of the Justice Department to obtain.

8.      From 1984 – 1985, as Directing Attorney of the National Center for Immigrants' Rights (now the Immigration Law Center), I served as lead counsel in two nationwide class actions against the United States, *Perez-Fuñes v. District Director*, 619 F. Supp. 656 (C.D. Cal. 1985) (serving as lead trial counsel), which was successful after a full trial on the merits; and *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal.1988), *aff'd*, *Orantes-Hernandez v. Thornburgh*, 919 F. 2d 549 (9th Cir. 1990), also successful in reforming the immigration system.

9.      From 1985 – 1986 I served as Director of Litigation, then as Directing Attorney, of the Legal Aid Society of Santa Clara County, where I was counsel through the trial of the remedy phase of a desegregation class action, which concluded with a favorable settlement. *Diaz v. San José Unified School District* (N.D. Cal. 1986).

10.     Other significant complex federal litigation in which I have served as lead counsel includes *Chester Residents Concerned for Quality Living v. Seif*, 132 F. 3d 925 (3d Cir. 1997), *summarily dism'd as moot*, 524 U.S. 974 (1998), which I successfully argued in the Court of Appeals, and *Alejandre-Garibay v. City of Keizer et al.* (D. Or. 2000), which settled and resulted in compensation from the United States, from Clark County, Washington, and from the city of Keizer, Oregon for an undocumented pregnant woman who lost her fetus.

11.     I have taught Constitutional Law and Civil Rights or related subjects at Seton Hall University School of Law, Villanova University School of Law, the University of San Diego School of Law, the University of Oregon School of Law, Lewis & Clark Law School, Willamette University College of Law, Southwestern Law School, the East China University of Law and Politics, Kuwait International Law School, and Ukrainian Catholic University (as a Fulbright Constitutional Law Specialist).

12.     I have also authored or co-authored numerous briefs as counsel for *amici curiae* in the U.S. Supreme Court, including representation of the Hispanic National Bar Association and the Hispanic Association of Colleges and Universities in the case of *Grutter v. Bollinger*, 539 U.S. 982 (2003); representation of the Cuban American Bar Association, the Cuban American National Foundation, the Hispanic National Bar Association, the American Immigration Law Foundation, and the American Immigration Lawyers Association in the case of *Crawford v. Suarez Martinez* (2004); and representation of the Asian American Legal Defense and Education Fund, the Asian Law Caucus, the Cambridge Haitian American Association, *Centro Presente*, the Chicago Religious Task Force on Central America, the Hispanic National Bar Association, the National Immigration Law Project of the National Lawyers Guild, the Unitarian Universalist Service Committee, and the Willamette Valley Immigration Project in the case of *Jean v. Nelson*, 472 U.S. 846 (1985).

13.     My publications include several books, including *The Law of Discrimination: Cases and Perspectives* (co-authored, LexisNexis 2011); *Civil Rights Litigation: Cases and Perspectives* (co-authored, Carolina Academic Press, 3 editions); and several law review articles on Constitutional Law and Civil Rights, including various religious topics as well as the First Amendment, such as "Hate Speech and the First Amendment: On a Collision Course?," 37 *Villanova Law Review* 723 (1992) and "Mercy v. Fear, or Where the Law of Migration Stands" (with Iryna Zaverukha), 40 *Seattle University Law Review* 1284 (2017). I have given scores of presentations, both nationally and internationally.

14      I have received numerous honors and awards and have served on many Boards of Directors, including on the Board of the American Constitution Society for Law and Policy for a decade. I am an elected member of the American Law Institute. My qualifications are more fully set forth in my *curriculum vitae*, attached as **Exhibit D, and my experience, reputation, and ability** are further documented by the Declaration of Charles H. Wheeler, Esq. (**Exhibit E**).

**Nature and Circumstances of This Case**

15.     Regarding the **nature and length of the professional relationship with the clients**, Plaintiffs retained me as counsel in this case on September 23, 2021, because they had a very particular need. The Plaintiffs had been practicing their religion as a congregation since 2017, but they have always been aware that the Defendants considered their religious ceremonies and sacrament to be illegal. In September 2020, this awareness turned into fear when Defendant Customs and Border Protection seized their sacrament and threatened Plaintiffs with criminal prosecution. These **circumstances imposed a sense of time urgency** given the prospect of additional interdictions and the Damocles' sword of arrest.

16.     Recognition by Defendants of the right to the religious use of *ayahuasca* or other Schedule I Controlled Substances was exceedingly rare at the time this case was filed, reflecting the **novelty and difficulty of the questions presented**. Until this case, only two religious institutions were given such permission, and this was made possible only after extensive litigation. *O Centro Espírita Beneficente União do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D. N.M. 2002), *aff'd*, *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006); *see also Church of the Holy Light of the Queen v. Mukasey*, 2008 U.S. Dist. LEXIS 102990*; 615 F. Supp. 2d 1210; *Church of the Holy Light of the Queen v. Holder*, 443 Fed. Appx. 302*; 2011 U.S. App. LEXIS 14710*. Moreover, this case is on the cutting edge of the law because it established, for the first time, the religious right of a non-Christian religion to use ayahuasca as a manifestation of religious belief.

17.     Many cases that were litigated attempting to establish such rights have been unsuccessful. *United States v. Meyers,* 95 F. 3d 1475 (10th Cir. 1996); *United States v. Quaintance*, 471 F. Supp. 2d 1153 (D. N.M. 2006); *Soul Quest Church of Mother Earth, Inc. v. Attorney General of the United States*, No. No. 22-11072 (11th Cir. 2023) (*ayahuasca*); *Arizona Yage Assembly v. Garland*, 595 F. Supp. 3d 869 (D. Ariz. 2022), 2023 U.S. Dist. LEXIS 78226 (*ayahuasca*). Plaintiffs endeavored to locate an attorney with sufficient expertise to establish their right to practice their religion. None was found in

Arizona. Jack Silver was contacted to represent Plaintiffs because he, like myself, had been counsel in one of only two such successful cases, *Church of the Holy Light of the Queen* (the *Santo Daime* case). Mr. Silver, in turn, contacted me, explained the basic facts, and informed me that he would only undertake representation of Plaintiffs in this case if I joined him as co-counsel in the effort to obtain the improbable result of winning. In light of the fact that many other religious *ayahuasca* cases were unsuccessful, we knew that this would not be an easy task. Shortly thereafter, I met with Dr. Tafur and some of the other members of the Church by Zoom and later, in person in Arizona. Mr. Silver and I are two of only a handful of attorneys in the nation with **the skill requisite to perform the legal service properly** in this specific type of litigation.

## Eligibility

18.     Fees are herein sought pursuant to 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976. That section provides: "In any action or proceeding to enforce sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, *the Religious Freedom Restoration Act of 1993*, or Title VI of the Civil Rights Act of 1964, or section 40302 of the Violence Against Women Act of 1994, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" (emphasis added).

## Value of the Rights Involved and Results Achieved

19.     Plaintiffs' prayers were answered, and everything in the Prayer for Relief in their Complaint was accomplished, as a practical matter, through the Settlement Agreement that has been reached with Defendants. Plaintiffs now have the right to import, transport, possess, and use their precious sacrament. There is nothing in the form of practical relief that Plaintiffs sought in this litigation that was not achieved. Although this Court granted Defendants' Motion to Dismiss on the Constitutional claims in the Complaint, it denied their Motion on the bases of jurisdiction, associational and personal standing, and under the Religious Freedom Restoration Act (RFRA), and Defendants' Motion for Stay was also denied. "Litigants in good faith may raise alternative legal grounds for a desired outcome,

and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). If the rule were otherwise, attorneys would be discouraged from taking on high risk cases such as this one. *Id.; see also Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1499 (9th Cir. 1995); *Grace Church v. City of San Diego* (S.D. Cal.), 2008 U.S. Dist. LEXIS 140559, at * 16 ("the Court should not reduce Plaintiff's award of attorneys' fees based on the church's failure to succeed on all asserted claims").

20.     Plaintiffs and their counsel consider this case to be a complete victory. As such, Plaintiff is the "prevailing party" because there is "a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 792 (1982). The "most critical factor in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (*quoting Hensley*, 461 U.S. at 436).

21.     This is a **novel** case because it is the first successful case that has involved the use of *ayahuasca* by a religious institution that is not Christian. Like the other successful cases establishing this right to religious freedom, the members of The Church of the Eagle and the Condor do have a sacred belief in a Deity, commonly referred to by most faiths as "God." As such, this is a ground-breaking development in the law. Such recognition of an emerging religion by the United States in the form of acknowledgment of Plaintiffs' rights in this context is truly historic.

22.     For most attorneys, this would probably be viewed as an **undesirable** case because it involved an attempt to vindicate the use of something on Schedule I of the Controlled Substances list. Particularly for those who do not appreciate unconventional or emerging belief systems, this might be viewed by an uninformed observer as unworthy of serious consideration, thus making it more difficult for Plaintiffs to locate counsel willing to take on the case. Moreover, the financial burden of litigating in the public interest on a contingency basis for almost three years makes this type of case even more **undesirable** to the Bar.

8

**Reasonableness of the Requested Award**

23.     My role in this litigation effort included conducting legal research, reviewing documents, drafting, reviewing, and editing pleadings, interviewing witnesses and reviewing declarations, participating in litigation strategy decisions, and appearing as the only counsel in the only proceeding before the Court, the Case Management Conference. I have served as lead counsel in the negotiations that led to settlement of this case. In terms of the **time and labor required**, my contribution to the success of this case is detailed with great specificity in **Exhibit A**. This litigation **precluded me from taking on other employment**.

24.     For the most part, I have recorded my time contemporaneously for this matter. I kept the time records for my work on this case, and I have personally reviewed each time detail to ensure accuracy and appropriateness.

25.     I have reviewed all entries in my time logs. I have ensured that there are no vague and ambiguous billing entries, block billing, excessive or duplicative billing, clerical tasks, or work unrelated to the merits. Each entry is in increments of half an hour. All my work done on this case that involved tasks of less than half an hour, such as short telephone calls and messages, brief reviews of messages, review of short documents, and similar activities, are not being billed, which reflects "**billing judgment**" as suggested by the Local Rules. I estimate that, consequently, my total number of hours has been reduced by approximately twenty per cent. Such reduction has a dollar value of $ 89,000 ($ 134,250 with a 50 % enhancement). I have cross checked my time entries with Plaintiffs' other attorneys where they have billed for the same event, such as conference calls, and ensured that my time does not exceed theirs. I worked on this case on a contingency basis and understood that I would not be paid for my work unless Plaintiffs were the prevailing party, thereby entitling me to fees under the Civil Rights Attorneys' Fees Awards Act of 1976.

26.     I am based in the Central District of California. As the circumstances of this case were described, local counsel in Arizona was unavailable to handle this specialized type of litigation. As such, rates outside the forum should be used. *Camacho v. Bridgeport Fin.,*

*Inc.*, 523 F. 3d 973, 979 (9th Cir. 2008); *see also* Order of Judge Roslyn O. Silver, *Prison Legal News v. Ryan*, No. CV-15-02245-PHX-ROS (D. Ariz. 3/19/2024) (finding San Francisco rates appropriate and awarding Plaintiff $ 2,370,881.67 in fees and expenses).

27.    It has been over 40 years since I was admitted to the California and District of Columbia Bars (1979 and 1980, respectively). Were I to have spent my entire career in private practice at a law firm, indubitably I would be a partner or shareholder.

28.    Publicly available sources confirm that rates in the Central District of California exceed rates charged by lawyers in Arizona. *E.g., Randolph v. II LLC,* 2022 U.S. Dist. LEXIS 86191, * 5 (rate for attorney admitted more than 20 years ago was valued at $ 567 per hour and deemed "consistent with rates charged by attorneys with comparable levels of experience at law firms in the Phoenix area metropolitan area"). To calculate my rate, I reviewed the extensive case law data available for prevailing market rates in the Central District of California. I determined that a rate of $ 895 per hour was equivalent to or even below the average Central District of California hourly rate awards in complex civil litigation for an attorney with experience comparable to mine.

29.    A reasonable hourly rate on which to compute a lodestar for my work on this case is $ 895 per hour given my experience, skill, and reputation compared to other lawyers working on similarly complex matters. *Gonzalez v. City of Maywood*, 729 F. 3d 1196 (9th Cir. 2013) (civil rights case). Under the lodestar method, the prevailing party may recover fees for "every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest." *Gary v. Carbon Cycle Ariz. LLC*, 398 F. Supp. 3d 468, 486 (D. Ariz. 2019) (*quoting Twin City Service v. Charles O. Finley & Co.*, 676 F. 2d 1291, 1313 (9th Cir. 1982)). **Entitlement** to such fees is based on my consideration of the twelve factors enumerated in *Carter v. Caleb Brett LLC*, 757 F. 3d 866, 869 (9th Cir. 2014) (*quoting Kerr v. Screen Extras Guild*, 526 F. 2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992),  namely "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the

1    preclusion of other employment by the attorney due to acceptance of the case, (5) the

2    customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by

3    the client or the circumstances, (8) the amount involved and the results obtained, (9) the

4    experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11)

5    the nature and length of the professional relationship with the client, and (12) awards in

6    similar cases."

7    30.      In assessing my lodestar, I have considered rates that other lawyers in California

8    charge. For example, in *State Fish Co, Inc.*, 2:15-bk-11084-SK (C.D. Cal. 2015), partners

9    Tuchin (admitted in 1990) and Bogdanoff (admitted 1985) of the firm Klee, Tuchin,

10   Bogdanoff, & Stern had recognized rates of $ 1080 per hour. In *Aichele v. City of Los

11   Angeles*, Case No. CV12-10863-DMG (FFMX) (C.D. Cal. 2015), "highly skilled attorneys

12   in the field of civil rights class actions, particularly law enforcement class actions," had an

13   average billing rate of $ 900 per hour ($ 875 - $ 1000), "current billing rates for attorneys

14   of the experience, skill, and reputation of appointed class counsel." The rates in these cases

15   decided by the U.S. District Court for the Central District of California were awarded nine

16   years ago. The 2019 hourly rate of Cotchett, Pitre, & McCarthy for a lawyer in California

17   admitted in 1992 was $925. That was also the 2019 rate of a lawyer admitted in 1987 at

18   the California firm of Goldstein, Borgen, Dardarian, & Ho. The 2019 rate for a California

19   lawyer admitted in 1979, as I was, at the firm of Hooper, Lundy, & Bookman was $ 1025.

20   The 2020 rates at Gibson, Dunn, & Crutcher in California were $ 960 hourly for senior

21   associates and ranged from $ 1395 - $ 1525 for senior partners. The 2020 rate for lawyers

22   with 25 years of experience at Paul, Hastings in California was $1425.The 2023 hourly

23   rates for lawyers in the firm of Rosen, Bien, Galvan, & Grunfeld in San Francisco include

24   Michael W. Bien (admitted in 1980), $ 1,525; Ernest Galvan (1997), $ 1,050; Lisa Ellis

25   (2005), $ 925; and Jenny S. Yelin (2010), $ 825. Declaration of Sanford Jay Rosen in

26   Support of Plaintiff's Motion for Attorneys' Fees and Expenses, *Prison Legal News v.

27   Ryan*, No. CV-15-2245-PHX-ROS (D. Ariz., filed 6/5/2023), Exhibit C, at 216. In other

28   cases, district courts in California awarded the following:

In *Wit, et al., v. United Behavioral Health*, 578 F. Supp. 3d 1060 (N.D. Cal. 2022), a case regarding liability for breaches of fiduciary duty and violations of the class members' health insurance plans under ERISA, the court awarded the following 2022 hourly rates as reasonable: Years of Experience Rates: 35 - $1,145; 24 - $1,040. In addition to these rates the court approved a 1.5 multiplier. In *Cole v. County of Santa Clara*, No., 16-CV-06594-LHK (N.D. Cal. 2019), a disability rights action asserting ADA claims on behalf of inmates with mobility disabilities in a challenge to accessibility in county jails, the court approved the following 2018 rate as reasonable: Years of Experience Rate: 20 - $775. In *May v. San Mateo County*, No. 3:16-cv-00252-LB, Stipulation and Order re Settlement (N.D. Cal. Nov. 10, 2017), an individual police misconduct action, the court found the following hourly rates reasonable: Years of Experience Rates: 26 - $775; Paralegal - $240. In *Armstrong v. Brown,* No. 4:94-cv-02307-CW (N.D. Cal), in a Stipulated Order Confirming Undisputed Attorneys' Fees and Costs in a prisoners' rights action, the court approved the following 2017 hourly rates for monitoring the injunction in that matter: Years of Experience Rate: 37 - $950.

31.     Given these data and based on inflation, I submit that my lodestar rate of $ 895 per hour is reasonable and below market rates.

32.     A lodestar multiplier of 0.50 (a 50 % enhancement) is appropriate in this case and reflects what would be **a customary fee charged in the type of matter involved**. Under federal law, a lodestar multiplier may be applied in the "rare" and "exceptional" case in which superior results are achieved because of the "superior" quality of the attorney's performance. *Perdue v Kenny A.,* 559 U.S. 542, 554 (2010). Courts have determined that such enhancements are appropriate where they are necessary to provide "fair and reasonable compensation" and where "the lodestar fee would not have been 'adequate to attract competent counsel'" *Perdue,* 559 U.S at 554 (quoting *Blum v. Stenson,* 465 U.S. 886, at 897, 901 (1984)). *See also Wing v Asarco, Inc.*, 114 F.3d 986 (9th Cir. 1997) (upholding 2.0 multiplier); *Desertrain v. City of Los Angeles*, 754 F. 3d 1147 (9th Cir. 2014)

1    (on remand, Judge Klausner applied a 1.2 multiplier); *Rodriguez v. County of Los Angeles*

2    (9th Cir. 2018) (awarding $ 5 million in attorneys' fees, inclusive of a 2.0 multiplier).

3    33.    The results obtained by litigating this case through to a settlement are truly

4    exceptional. As discussed in the Circumstances of this Case, *supra*, this settlement

5    constitutes an exceptional result by any measure. First and foremost, it affords Plaintiffs

6    all the relief they could have obtained had this case gone to trial. There has not been a

7    successful RFRA case of this kind in the past 15 years. Aside from the exceptional results,

8    Plaintiffs' counsel had to overcome numerous obstacles to obtain such widespread

9    systemic relief. Every conceivable defense appears to have been raised by Defendants,

10   many of which would have jeopardized Plaintiffs' victory had counsel not been so skilled

11   at responding to them. Each issue and sub-issue had to be thoroughly analyzed and

12   addressed, which counsel did with almost uniform success. Such a level of success,

13   achieved against defendants with vast resources and highly capable representation, is

14   undeniably exceptional.

15   34.    A multiplier is appropriate and reasonable in light of the need to attract competent

16   counsel willing and able to take on the substantial challenge that members of religious

17   organizations face when they use a sacrament that contains a Schedule I substance. *See,*

18   *e.g., Guam Soc'y of Obstetricians & Gynecologists v Ada,* 100 F.3d 691, 697 (9th Cir 1996)

19   (2.0 multiplier appropriate when "necessary" to attract competent counsel); *Chabner v*

20   *United of Omaha Life Ins. Co.* 1999 US Dist. Lexis 16552, *19 (N.D. Cal., Oct. 12, 1999,

21   No. C-95–0447 MHP), *aff'd* (9th Cir. 2000) 225 F.3d 1042. **A multiplier is particularly**

22   **appropriate in cases like this that are taken on a contingency basis and seek injunctive**

23   **relief, with no monetary damages from which to receive a fully compensatory fee.**

24   *Guerrero v. Camp Pendelton & Quantico Housing, LLC*, Slip Copy, 2024 WL 388079, *7

25   (C.D. Cal. 2024) (awarding $ 351,780 under the Fair Employment & Housing Act (FEHA)

26   to a lawyer with over 30 years of experience, based on rate of $ 750 and multiplier of 0.10

27   on the ground of the "contingency risk"). "District courts in the Ninth Circuit have treat[ed]

28   motions for attorneys' fees under FHA, FEHA [Fair Housing Act], and § 1988 largely

13

1   identically.'" *Id.* at n.2 (*quoting Roman v. MSL Capital LLC*, No EDCV 17-2066 JGB

2   (SPx), 2019 WL 3017765, at 6 n.2 (C.D. Cal. 2019)). Contingency RFRA cases, such as

3   this, seeking only injunctive relief, provide significantly less incentive to highly skilled

4   attorneys than damages cases. The latter, unlike the former, provide a remedy from which

5   to recover a fee. The "percentage of recovery method" is thus unavailable. Kim v. Allison,

6   F. 4th 1170, 1180 (9th Cir. 2021). Factors, including contingent risk, preclusion of other

7   employment, and the like, significantly diminish the financial incentives to take cases

8   seeking injunctive relief, to the detriment of the policies underlying RFRA and other

9   similar civil rights statutes. The modest multiplier sought here would serve to restore some

10  of that incentive. The expense and risk of public interest litigation has not diminished over

11  the years; to the contrary, the pursuit of these cases is in many ways more difficult than

12  ever. As a result, fewer and fewer attorneys and firms are willing to take on such litigation,

13  and the few who are willing to do so can only continue in their efforts if their fee awards

14  reflect full market value and if appropriate multipliers are awarded in the exceptional cases

15  in which they are justified.

16  35.     Further, payment was substantially delayed by the length of the case, and by

17  Defendants' dilatory tactics. The case was initially filed on June 9, 2022 and only settled

18  more than twenty-two (22) months later, after most trial preparations were complete.

19  Unlike Defendants' attorneys, who are paid monthly regardless of outcome, Plaintiffs'

20  attorneys are only paid if they are the prevailing party, and they absorb significant delay

21  between filing the case, settlement, and distribution of the final award. To account for this

22  delay and for all of the other factors explicated, Plaintiffs request a 0.5 enhancement.

23  36.     For all these reasons, I submit that my hourly rate of $ 895 is reasonable, and that

24  an enhancement of 50 % is appropriate. With the enhancement, this yields a rate of $

25  1342.50 and a total of $ 671,250 based on a total of 500 hours worked. Because of the

26  specialized religious liberty expertise for which I was retained, the rare nature of this case,

27  and the exceptional results obtained, this award is appropriate and based on relevant factors

28  under the law.

37.     I am aware of the **awards in similar actions** the United States made to settle fee petitions in the two other cases involving the religious use of *ayahuasca*. I served as counsel in one of those cases. In the *Santo Daime* case, the fees obtained totaled $ 1,538,480. In today's dollars, that would be $ 2,235,085. In the *UDV* case, the fees totaled $3,150,000. In today's dollars., that would be $ 4,872,667. Should this case go to trial, the United States would incur liability for a far greater amount in fees than it had in those cases that occurred so many years ago.

38.     My paralegal bills at the rate of $ 200 per hour, and her total of $ 1100 is based solely on hours worked without a fee enhancement. She was responsible for organizing all of the log sheets, ensuring that they were put accurately into electronic form, and for double-checking the accuracy of the computations. She has decades of experience working on legal issues.

39.     I reserve the right to supplement this fee request declaration for any fees attributable to this case for any hours expended after this fee request is submitted.

I declare under penalty of perjury under the laws of the United States of America and of this Court that the foregoing is true and correct.

June 17, 2024                                        */s Gilbert Paul Carrasco*
                                                    Gilbert Paul Carrasco

15