Ismail L Ali, esq. - *pro hac vice*
2134 10th Ave, A
Oakland, CA 94606
Tel.: 559-801-7317
E-mail: lourido.ali@gmail.com
California State Bar No. 312660 (active)

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| The Church of the Eagle and the Condor, *et al.,* | Case No. 2:22-cv-01004-PHX-SRB |
| Plaintiffs, | **DECLARATION OF ISMAIL L. ALI IN SUPPORT OF PLAINTIFFS' PETITION FOR ATTORNEYS' FEES AND COSTS** |
| v. | |
| Merrick Garland, *et al.*, | |
| Defendants. | |

I, Ismail L. Ali, declare as follows:

1.  I have personal knowledge of the facts stated in this Declaration, and if called to testify, I can competently testify to the truth of these facts.

2.  I am Director of Policy & Advocacy at the Multidisciplinary Association for Psychedelic Studies (MAPS), a 501(c)(3) nonprofit focused on research and education which was founded in 1986 and is widely credited with bringing psychedelic science and therapy into the public eye and leading the contemporary movement for psychedelic policy reform.

3.  I have operated a solo legal practice since 2019 and am counsel for Plaintiffs the Church of the Eagle and the Condor (CEC), Joseph Tafur, M.D., Kewal Wright, Belinda Eriacho,

M.P.H., Benjaman Sullivan, and Joseph Bellus in the above-entitled action. My Representation Agreement, executed on September 30, 2021, is attached to the Fee Motion. (See Fee Motion, Exhibit C).

4. I offer this Declaration in support of Plaintiffs' petition for attorneys' fees and expenses under 42 U.S.C. § 1988 (b). General elements related to eligibility and entitlement for attorneys' fees, as well as factors impacting that analysis like time urgency, novelty and difficulty, desirability, the value of the rights involved, the results achieved, the requested award, and the time and labor necessary to achieve the results, are described in Plaintiffs' Fee Motion and in the Declaration of CEC lead counsel Jack Silver.

5. Plaintiffs seek $123,378.80 for the work I did on this case. This amount is based on at the reasonable market rate of $550 per hour, for about 150 hours, totaling $82,253, with a 1.5 multiplier due to factors including the novelty and complexity of this case, as described in the Fee Motion. The number of hours is the sum of about 132.5 hours reasonably expended working on the merits of this case, and about 17.5 hours expended working this fee petition. It is "well established that time spent preparing fee applications under 42 U.S.C. § 1988 is compensable." *Gonzales v. City of Maywood*, 729 F. 3d 1196, 1210 (9th Cir. 2013). A task-based itemized statement that reflects the date on which my legal services were performed, a description of the services provided, and the time devoted to each task, is attached as **Exhibit A**.

6. These calculations are based on my declaration below, a supporting declaration from California attorney Terry Gross, and my specific attorney time records in the above-referenced Exhibit.

**The Experience, Reputation and Ability of Counsel**

7. In 2012 I received my B.S. in Philosophy with honors, with minors in Spanish Literature and Creative Writing, from California State University, Fresno. In 2016 I received my J.D. from the University of California, Berkeley School of Law. That year, I took and passed the California Bar Exam, and was admitted to practice in California in November 2016. I am currently a member of the State Bar of California (CA Bar #312660). I am admitted to practice in the United States District Court in the Northern District of California. My

appearance in this case is pro hac vice.

8.  I began engaging with drug policy reform in 2013, while I was still in law school, focusing initially on cannabis regulation and harm reduction. My work with MAPS, where I have dedicated the most of my professional time for the last eight years, began on a volunteer basis in 2015. In 2016, Berkeley Law awarded me a one-year public service fellowship to work with MAPS, during which I co-founded MAPS' policy and advocacy department. Upon completion of this fellowship, MAPS hired me full-time as Policy Counsel, a role I held from 2017 until MAPS hired a full-time in-house general counsel in 2021. During that time, I established the organization's legal infrastructure, which involved advising about both outward-facing legal strategy – including direct engagement with agencies like DEA – as well as numerous internal legal matters related to corporate governance, program compliance, and organizational development. In this role, I was the first person doing paid, full-time psychedelic policy reform and legal advocacy in the United States. Since 2021, I have served as the Director of Policy & Advocacy at MAPS.

9.  In addition to my work at MAPS, I have operated a solo legal practice since 2019. My work on the CEC case is in my independent capacity, not as a MAPS staff member or representative. However, my work at MAPS has significantly informed my role with CEC.

10. Over my career, I have provided input on U.S. state legislation and citizen-led initiatives, federal reform efforts, and municipal resolutions, and participated in countless discussions with government representatives and advisors around the world. Specifically, I have supported the design and implementation of evidence-based psychedelic law and policy frameworks, and pursued psychedelic policy reform through various means, including: administrative procedures and legislative advocacy; expert and public education; professional mentorship and capacity building; communication and translation of complex research and concepts for public education via articles, posts, reports, testimony, and comments; and thousands of conversations with legal professionals, researchers, community organizers, elected representatives, and legislative committees and committee staff. This has provided me with valuable experience navigating the law regarding, relationships with, and submissions to domestic regulatory and research agencies including Health and Human Services, the National Institute of Health, the Food and Drug Administration, and – most relevantly for the CEC case - the Department of Justice, especially the Drug Enforcement

Administration (DEA).

11. In 2017 I became the primary lead of MAPS' efforts to end the monopoly held by the National Institute of Drug Abuse (NIDA) on cultivation of federally legal research cannabis. In my capacity on that matter, I helped take to completion a decades-long effort urging DEA to license additional cannabis cultivators for clinical research, using litigation, Congressional inquiry, and other mechanisms to open the field for scientific advancement in medical cannabis research. MAPS' efforts culminated in a lawsuit filed by MAPS research collaborator Scottsdale Research Institute, with expert and advisory support from MAPS as an organization and me personally. The situation was resolved when the DEA first announced and then, years later, actually allocated bulk manufacture licenses to additional growers, allowing lifesaving, federally-legal cannabis research to expand for the first time in almost fifty years. This experience exposed me to DEA's goals, practices, and behavior, relevant for the interaction with the agency required to take the CEC case to settlement.

12. Since 2018, I have done substantive research about and advised MAPS and other organizations on legal matters relating to psychedelic substances and: state and federal interactions; implementation of statutory and regulatory frameworks; medical scope of practice; cultural and economic considerations related to the expansion of rights and protections for cultivators, manufacturers, practitioners, and participants; and most relevantly for this case, the incorporation of religious, spiritual and sacramental use into such frameworks. In this capacity, I have interfaced extensively with law enforcement and public safety institutions, which has given me an understanding of issues related to safety and diversion, as well as technical knowledge of the known toxicological, physiological, and psychological risks related to psychedelic substances including ayahuasca.

13. In 2020, after voters in the state of Oregon passed Measure 109, the first state-regulated psychedelic access scheme in the country, I was invited to join the Social Equity subcommittee of the Oregon Psilocybin Advisory Board (OPAB), which reviewed proposals from the other subcommittees through the lens of equity and access, and also to evaluate their practicality for implementation. I was a primary contributor to that subcommittee until it formally sunset, after about twenty months, in the wake of OPAB's final rulemaking and implementation. In that role I reviewed nearly every proposed, and then actual, rule developed to regulate Oregon's program through the Oregon Health Authority (OHA) and

became intimately familiar with the most up-to-date best practices for and knowledge of administrative mechanisms regulating state-managed programs. This gave me a strong understanding of the full scope of issues implicated by state legalization, including the most legally relevant information about contemplated exemptions or limitations for religious use in the context of a such a program. One topic often raised included differentiating spiritual or religious use from medical or therapeutic treatment, a necessary evaluation in today's policy landscape, and an analysis that is critical to understand the current state of the law as it relates to the religious use of ayahuasca.

14. From 2018 to 2021 I served on the Advisory Board of the Ayahuasca Defense Fund, where I was exposed to the facts of, provided legal advice about, and consulted on policy and media responses to numerous domestic and international cases related to psychedelic substances. For many years, ayahuasca was the most frequent traditional substance involved in criminal and civil cases related to entheogenic substances around the world, so I witnessed relevant trends related to ayahuasca's globalization, popularity, and visibility change over time.

15. Since 2019, I have been an active member of Chacruna Institute's "Council for the Protection of Sacred Plants," a volunteer group of experts that consults with plant medicine churches and others with legal concerns about this topic. CEC co-counsel Martha Hartney and Sean McAllister are on or have also participated in the Council. The Chacruna Institute was founded by Brazilian anthropologist Bia Labate, PhD, who has studied ayahuasca for over twenty years and published approximately 20 books on the subject. I gave substantive input on the Chacruna publication "Guide to RFRA and Best Practices for the Psychedelic Plant Medicine Churches" a public legal education resource published in 2021.

16. In 2020, I co-founded and was the first co-chair of the board of the Psychedelic Bar Association (PBA). The PBA is an association of attorneys from all practice areas and perspectives dedicated to solving the legal and policy issues in the psychedelic sector. The organization serves a diverse network of lawyers committed to the highest standards of professionalism by providing education, coalition-building, and community. Since its founding, I have developed, curated, and delivered professional continuing education programs about psychedelic substances and best practices for attorneys across the country and world. I currently chair the Religious Use Committee of the PBA, where I am consistently exposed to, engage with, and educate about issues related to religious use of

psychedelics with other attorneys across the country.

17.    Since 2021, I have participated in discussions with the Sacred Plant Alliance, a 501(c)(3) nonprofit organization comprised of ayahuasca and other plant-medicine-based religious organizations. The purpose of the Sacred Plant Alliance is to develop best practices and self-governing standards for religious organizations using sacraments like ayahuasca, and my proximity to and engagement with this network has further refined my understanding of the relevant legal issues.

18.    In sum, my staff role at MAPS, and my leadership and volunteer roles with other relevant organizations described above, has developed my highly specialized knowledge about how psychedelic substances implicate legal issues related to state and federal agencies, delivery of care, scope of practice, intellectual property, criminal law, federal preemption, administrative law, and spiritual and religious practice, (broadly referred to as "psychedelic law").  Many people and traditions use psychedelics in sacramental contexts, so the topic comes up in nearly every policy discussion.

19.    Around 2019, I took the years of professional experience, independent research, and personal exposure I had to entheogenic spiritual practices and modalities and began actively working closely with attorneys like CEC co-counsel Martha Hartney and Sean McAllister, as well as with other legal experts in the field of sacramental religious use of psychedelics like Allison Hoots. In that time, I began providing legal advice to churches that work with entheogenic sacraments and I have consulted with several plant medicine churches, primarily ones that utilize ayahuasca. My work for these communities included advising them on the case law, policy, and standards regarding the Religious Freedom Restoration Act (RFRA) and the Internal Revenue Service (IRS), corporate formation and governance, drafting of doctrine and articles of faith, codes of conduct and ethics, and safety and emergency protocols. In this role, I also regularly provide legal advice to other attorneys, medical professionals, and others engaged in psychedelic spirituality and care, and have extensively consulted with subject matter experts on psychedelic religious ethics, best practices, harm reduction, media relations, and cultural framing.

20.    This professional experience in matters related to psychedelic law, care, ethics, safety, spirituality, and culture has made me a valuable and unique contributor to the CEC matter.

DECLARATION OF ISMAIL L. ALI – 2:22-cv-01004-PHX-SRB - 6

All of these topics are implicated in, and form the basis of, my legal support on the case.

21. Because of and beyond these roles, I have been a leader in the field of psychedelic policy and law reform since the beginning of my career. Given my background and reputation in the field, I have been asked to curate, speak, and teach at dozens of public and private events, panels, webinars, podcasts, and courses on the law, policy, culture, and spirituality of psychedelic substances and sacraments.

22. My qualifications are more fully set forth in my resume, attached as **Exhibit B,** and the reasonableness of my fee in the context of my experience, reputation, and ability are further documented by the Declaration of Terry Gross, attached as **Exhibit C**,

**<u>Nature and Circumstances of this Case</u>**

23. I have known Dr. Tafur, CEC's chief ayahuasquero, since 2018. I was initially familiar with his published work, his affiliation with Chacruna Institute, and his advocacy and respect for the spiritual traditions of ayahuasca. I first learned about his work with the CEC at a psychedelic-assisted therapy training which MAPS hosted in 2019, and we connected further because we both have Colombian ancestry and experience with psychedelics in traditional contexts.

24. I have known Belinda Eriacho, CEC Board member, since 2019. I was familiar with her work bridging the gap between the psychedelic field and Indigenous spirituality, and also connected further with her at the aforementioned psychedelic therapy training hosted by MAPS in 2019. Since then, we have collaborated in multiple ways, primarily at the intersection of legal issues and cultural dynamics concerning Indigenous spirituality and psychedelic practices.

25. Dr. Tafur and Belinda Eriacho personally invited me to be co-counsel in this case, primarily because they believed I would be uniquely positioned to understand the legal issues that would assist the CEC board and Plaintiffs in navigating certain elements of the upcoming litigation, in particular their trust in my capacity to respond to inquiries into the CEC's Indigenous religious practices that Plaintiffs would have to surmount to win the case. I was also retained because of my professional experience with and broad knowledge about the intersection of legal issues and scientific research, as well as my reputation in the field as a

trusted lawyer who can bridge and culturally translate the relevant legal issues concerning religious use, spiritual practice, Indigenous tradition, and syncretic or hybrid sacramental approaches.

26.     I was formally brought on to the CEC team on September 30, 2021.


**Role in CEC Litigation**

27.     In this case, I played several roles commensurate with my capacity and experience. First and throughout, I conferred extensively with CEC Board members to fully understand the cosmological and ontological framework on which its belief systems were based. It is the nature and sincerity of these belief systems that made up the foundation of plaintiffs' complaint and justify its position in seeking exemption from the Controlled Substances Act.

28.     To clarify and refine this framework, I interviewed declarants and prepared plaintiff declarations. This was an essential part of establishing and explaining Plaintiffs' bona fide beliefs to Defendants. CEC co-counsel Martha Hartney and I conducted all of the extensive, often multiple, face-to-face interviews (via video) with each of the named declarants as well as other unnamed church members, understanding each person's personal biographic history and worldview, and how it interacted with the CEC and the elements of this case. Having two attorneys work this critical issue – Martha who declarants trusted and had worked with in the context of her role as CEC counsel and member, and me as a trusted outsider who was able to understand their experiences in a broader context and tease out legally salient facts – was essential to secure an effective analysis. These interviews necessitated characterizing, asking about, and substantively understanding emotional and extremely vulnerable and personal information about spirituality, mental health, family of origin, and at times, persecution based on identity or belief systems. This phase took weeks to research declarations made in relevant case law, identify potential CEC plaintiffs, research their backgrounds, interview them, compile notes, discuss with co-counsel, support the drafting and editing of their declarations, reviewing case law about associational standing and related topics to determine whether or not to name certain plaintiffs, and follow-up to ensure that changes made along the life cycle of the litigation were accurate and properly aligned with their understanding. Given their key role in establishing sincerity we took as much time as we thought appropriate to fully refine our case.

29.   In addition to general review of the complaint, I most specifically reviewed the complaint for alignment with those plaintiff declarations, which established core elements of the Plaintiffs' case, including for example why the destruction of the CEC's ayahuasca was a sufficient injury to constitute standing, despite the lack of a prosecution to show harm. It was in this role that my most unique expertise and experience were utilized: the ability to understand where and how individual spiritual belief systems interact with and stand up to the scrutiny of legal analysis. This required specialized skill and discernment, including identifying which key elements of individual plaintiffs' worldviews were relevant to their association with the church and the rights they were demanding and recognizing how their beliefs might be evaluated by the court or by the government, all while ensuring that they were speaking from their own true voice. The fact that Plaintiffs' religious sincerity was so well established by the Complaint and declarations that it was immediately accepted by the Defendants, despite Defendants' challenges to sincerity in other high-profile ayahuasca cases, points to the success of this approach.

30.   In the absence of early signals that Plaintiffs and Defendants would be able to settle the case, CEC had to retain experts to respond to expected and novel questions or issues raised by Defendants. My role at MAPS and work in the field has exposed me to the most sophisticated and respected experts in the field; so, I was instrumental in supporting the identification and vetting of subject matter experts, in particular the theologian and psychiatrist, necessary to establish both the CEC's religious bona fides and a psychological safety profile based on the most up-to-date evidence and practice.  Finding experts for this case required identifying and doing due diligence on multiple potential expert candidates, interviewing top options, and discussing findings with co-counsel. I, along with Martha Hartney with support from the other co-counsel, made our decisions based on our assessment of who had had the rare requisite knowledge of 1) traditional majority religions that are most often used as the blueprint for legal evaluation of religious beliefs in the US, and 2) Indigenous and earth-based spiritual traditions that use entheogenic substances like ayahuasca. Preparing these experts to interact with CEC declarants required an extremely sensitive cultural translation that brought to bear my knowledge of the law, of culture, and of Indigenous and syncretic ayahuasca-based spiritual practices.

31.    Before the initiation of settlement negotiations, over the course of the aforementioned interviews and later, I spoke with CEC declarants to begin their preparation for depositions, including closely reviewing transcripts from the prior RFRA ayahuasca cases and other relevant religious use cases to prepare a roadmap to support that potential outcome. While the case entered a settlement posture before discovery was completed, this preparation was absolutely necessary in the likely case any named Plaintiffs – most with no experience in that position – would be deposed.

32.    In addition, over the course of the litigation, I reviewed every filing, offering "fresh eyes" and issue spotting on documents, including the complaint, response to Defendants' motion to dismiss, and the negotiated settlement agreement. I helped craft interrogatories and requests for production of documents based on my understanding of the current state of research, gaps in research, and assertions made by Defendants about the sacrament at issue (ayahuasca). I also reviewed and researched updates to the body of relevant scientific literature that impacted foundational elements of Defendants' position, including actual risk of harm or danger related to ayahuasca.

33.    Throughout the nearly three-year process of this case, I supported the relationship management and navigation of unique cultural issues with Plaintiffs, who – as established in the complaint – practice a syncretic spiritual approach found nearly nowhere else on the continent. I checked in and engaged with Plaintiffs whenever necessary and appropriate to ensure fidelity of the legal filings with their belief systems, and was often brought in by co-counsel to support specific legal issues that emerged throughout.

**Time Keeping Practices**

34.    It is my practice to maintain contemporaneous records of time spent on legal matters and to update those records as they advance, including immediately after meetings or focused work. As part of preparing this declaration, I made a thorough review of my relevant time records and prepared an abstract of the work performed, eliminating hours relating to excluded projects.

35.    I had no personal expenses in this case, and so claim no costs incurred in this case, except the cost of the *pro hac vice* application.

DECLARATION OF ISMAIL L. ALI – 2:22-cv-01004-PHX-SRB - 10

36.     In preparing my daily account of work, I exercised billing judgment as suggested by the Local Rules, and omitted categories of time which were devoted to activities which might be argued to be extraneous to the litigation process, or that might be deemed duplicative. With a number of those activities, I omitted rote administrative tasks, and other than phone calls with one or more co-counsel in which we were discussing specific legal elements of the case, I reduced my time entries significantly beyond the time I had worked (often by about 30%-50%) so that there could be no question that my time entries were reasonable for the particular tasks.

**Reasonableness of Requested Award**

37.     I am based in the Northern District of California. As described in Plaintiffs' Fee Motion, local counsel in Arizona was unavailable to handle this specialized type of litigation. As such, rates outside the forum should be used. *Camacho v. Bridgeport Fin., Inc.*, 523 F. 3d 973, 979 (9th Cir. 2008); *see also* Order of Judge Roslyn O. Silver, *Prison Legal News v. Ryan*, No. CV-15-02245-PHX-ROS (D. Ariz. 3/19/2024) (finding San Francisco rates appropriate and awarding Plaintiff $2,370,881.67 in fees and expenses).

38.     As noted in the Fee Motion, a reasonable attorney's fee is determined by calculating the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This figure is called the lodestar and is presumed to represent an appropriate fee. *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1541-42 (9th Cir. 1992). To assist the Court in arriving at the "lodestar" figure, the Ninth Circuit has adopted a list of factors to be considered where relevant, the so called "Kerr factors": (a) the time and labor required, (b) the novelty and difficulty of the questions involved, (c) the skill requisite to perform the legal service properly, (d) the preclusion of other employment to acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or contingent, (g) time limitations imposed by the client or the circumstances, (h) the amount involved and the results obtained, (i) experience, reputation, and ability, (j) the "undesirability" of the case, (k) the nature and length of the professional relationship with the client, and (l) awards in similar cases. *Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir. 1975). These factors are generally analyzed in relation to the case in the Fee Motion, and specifics related to my representation are clarified in this declaration.

39.     As noted in the Fee Motion and like co-counsel on this case, the fee contracted between CEC and me was contingent. There are no RFRA cases that can be used to directly determine the appropriate fee, but district courts in California where I am admitted to practice have awarded a range of rates in non-RFRA but partially comparable civil rights cases.

   In *Wit, et al., v. United Behavioral Health*, a case regarding liability for breaches of fiduciary duty and violations of the class members' health insurance plans under ERISA, the court awarded the following 2022 rates [Years of Experience: Rates]: 35: $1,145;  24: $1,040; 21: $980; 18: $825; 10: $690 (578 F. Supp. 3d 1060, N.D. Cal. 2022). In addition to these rates, the court approved a 1.5 multiplier.

   In *Cole v. County of Santa Clara*, an action asserting ADA claims on behalf of inmates with mobility disabilities to challenge accessibility of county jails, the court approved the following 2018 rates [Years of Experience: Rates]: 20: $775; 13: $650; 8: $525; 5: $425; 2: $375; Paralegal: $225-$340 (16-CV-06594-LHK (N.D. 2019)).

   In *May v. San Mateo County*, an individual police misconduct action, the court found the following hourly rates reasonable [Years of Experience: Rates]: 26: $775; 22: $775; 10: $475; 5: $425; Paralegal: $240 (N.D. Cal. No. 3:16-cv-00252-LB, Stipulation and Order re Settlement filed Nov. 10, 2017).

   In *Armstrong v. Brown*, a prisoners' rights, the court approved the following 2017 hourly rates for monitoring the injunction in that matter [Years of Experience: Rates]: 37: $950; 33: $825; 20: $780; 12: $650; 9: $490; 8:$480; 7:$470; 6:$440; Paralegal: $240-325 action (N.D. Cal. No. 4:94-cv-02307-CW, Stipulated Order Confirming Undisputed Attorneys' Fees and Costs).

40.     In the cases listed above, in particular *Cole* (2019)*, May* (2017)*,* and *Armstrong* (2017)*,* attorneys with 5-8 years of experience won between approximately $425-$525 per hour. When adjusted for inflation, that range is $540-$660 per hour.

41.     Because my roles as Policy Counsel and Director of Policy and Advocacy at MAPS are salaried, full-time positions, I have not billed hourly rates for the legal advice I have given to the organization since I started there in 2016. In my solo legal practice, the last time I took a new case before ceasing all my additional cases to focus on the CEC case was in 2021, so I have not been paid for any legal services in my practice since then. My 2021 rate for compensated legal work, where payment was made in advance on retainer and did not

include litigation, was $360. This number is not reflected in my Fee Agreement with CEC.

42.   As a result of accepting the work on this case, I was precluded from taking other cases and paused taking on new legal clients in 2022. I am in debt over a quarter million dollars in student loans from law school and am about seven years into the federal ten-year Public Service Loan Forgiveness plan. I must stay employed full-time for a charitable or government organization in order to qualify for loan forgiveness. Thus, the overwhelming majority of my legal services outside of MAPS for other clients has been pro bono.

43.   I also consulted with attorneys who litigate similar suits and are familiar with my work.

44.   For this case I am billing at $550 per hour. Given the above data as adjusted for inflation, I submit that this lodestar rate is comparable to the range of rates deemed reasonable for my number of years of experience and the complexity, novelty, and undesirability of this case.

45.   Based on this due diligence, my years of experience, my unique expertise, the Declarations of other attorneys made part of this fee application, and my intentional omissions, I believe my request for compensation is reasonable.

**Summation of Fees and Costs**

46.   The work I performed, and time required to perform each activity is set forth in a timesheet, attached as **Exhibit A** to this Declaration. In this narrative I have omitted that which is sufficiently explained by **Exhibit A**, as well as what is sufficiently explained by Plaintiffs' Fee Motion. My time spent drafting this Declaration describing my work on this case, including a detailed listing of hours, is included in that timesheet.

47.   My timesheet details about 150 billable hours expended in this litigation to date, for which my hourly fee ($550) over those hours totals $82,253. With a 1.5 multiplier, as justified by Plaintiffs' Fee Motion, my fee request is $123,378.80.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 17th day of June, 2024 in Oakland, California.

_____
ISMAIL L. ALI, ESQ

DECLARATION OF ISMAIL L. ALI – 2:22-cv-01004-PHX-SRB - 13